Dale M. Cendali
Claudia E. Ray
Courtney L. Schneider
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: 212-446-4800
Fax: 212-446-4900

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                                     :

PAUL GREGORY ALLEN, TRUSTEE OF THE  :
ESTATE OF ADRIAN JACOBS,

                        :
          Plaintiff,               :    10 Civ. 5335 (SAS)
                        :
    - against -              :    ECF Case
                        :
SCHOLASTIC INC.,             :
                        :
                        :
          Defendant.          :
                        :
------------------------------------------------------- X

**MEMORANDUM OF LAW OF DEFENDANT SCHOLASTIC INC.
IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

FACTUAL BACKGROUND ..............................................................................2

A.      THE WORKS AT ISSUE..........................................................................2
        1.     Plaintiff's Work: *The Adventures Willy the Wizard -- No 1 Livid Land*.................2
        2.     Defendant's Work: *Harry Potter and the Goblet of Fire* .......................................5

B.      LEGAL STANDARD: RULE 12(B)(6)....................................................8

ARGUMENT ......................................................................................................9

A.      PLAINTIFF CANNOT STATE A CLAIM FOR COPYRIGHT
      INFRINGEMENT.....................................................................................9
        1.     Elements of Copyright Infringement Claim .................................9

B.      A COMPARISON OF THE WORKS SHOWS NO SUBSTANTIAL
      SIMILARITY..........................................................................................11
        1.     The Works' Plot Elements Are Not Similar ...............................12
            a.     The Overarching Storylines Differ Completely.........................12
            b.     The Competitions In Each Work Are Different............................13
            c.     The Means Of Transportation Are Different .............................16
            d.     No Similarity Between Any Protectable Elements....................18
        2.     Characters Of The Works Are Not Similar...............................19
        3.     The Settings of the Works Are Not Substantially Similar....................21
        4.     The Themes Of The Works Are Not Similar................................23
        5.     The Total Concept and Feel Of The Works Differ .............................24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A Slice of Pie Productions LLC v. Wayans Bros.*,
    487 F. Supp. 2d 41 (D. Conn. 2007)..................................................... 20, 21

*Adams v. Warner Bros.*,
    No. 05 Civ. 5211, 2007 WL 1959022 (E.D.N.Y. June 29, 2007) ............... 10, 25

*Am. Direct Mktg. v. Azad Int'l, Inc.*,
    783 F. Supp. 84 (E.D.N.Y. 1992) ....................................................... 10

*Bell v. Blaze Magazine*,
    No. 99 Civ. 262718, 2001 WL 262718 (S.D.N.Y. Mar. 16, 2001) ................ 11

*Bill Diodato Photography, LLC v. Kate Spade, LLC*,
    388 F. Supp. 2d 382 (S.D.N.Y. 2005)................................................... 22

*Blakeman v. The Walt Disney Co.*,
    613 F. Supp. 2d 288 (E.D.N.Y. 2009) ............................................ 11, 20, 24

*Boyle v. Stephens, Inc.*,
    No. 97 Civ. 1351, 1998 WL 80175 (E.D.N.Y. Feb. 25, 1998)...................... 11

*Buckman v. Citicorp*,
    No. 95 Civ. 0773, 1996 WL 34158 (S.D.N.Y. Jan. 30, 1996)...................... 10

*Castle Rock Entm't, Inc. v. Carol Pub. Group Inc.*,
    150 F.3d 132 (2d Cir. 1998)............................................................... 9

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
    499 U.S. 340 (1991).......................................................................... 9

*Hoehling v. Universal City Studios, Inc.*,
    618 F.2d 972 (2d Cir. 1980)............................................................... 10

*Hogan v. DC Comics*,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999).............................................. passim

*Hudson v. Universal Pictures Corp.*,
    No. 01 Civ. 1008, 2004 WL 1205762 (E.D.N.Y. Apr. 29, 2004).................... 18

*Jones v. CBS, Inc.*,
    733 F. Supp. 748 (S.D.N.Y. 1990) ...................................................... 24

*Le Book Publ'g, Inc. v. Black Book Photography, Inc.*,
    418 F. Supp. 2d 305 (S.D.N.Y. 2005)........................................................ 10, 11

*LLB Corp. v. Lucas Distribution, Inc.*,
    No. 08 Civ. 4320, 2008 WL 2743751 (S.D.N.Y. July 14, 2008) ........................................ 8

*Mallery v. NBC Universal, Inc.*,
    No. 07 Civ. 225, 2007 WL 4258196 (S.D.N.Y.  Dec. 3, 2007)........................... 18, 20, 24

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976)........................................................... 10, 18, 24

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).................................................................... 8

*Smith v. Weinstein*,
    578 F. Supp. 1297 (S.D.N.Y. 1984)........................................................... 19

*Tabachnik v. Dorsey*,
    No. 04 Civ. 9865, 2005 WL 1668542 (S.D.N.Y. July 15, 2005) ................................... 8

*Velez v. Sony Discos*,
    No. 05 Civ. 0615, 2007 WL 120686 (S.D.N.Y. Jan. 16, 2007)...................................... 10

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986)................................................................ 10, 12

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996)................................................................ 11, 21

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................... 8

## PRELIMINARY STATEMENT

In a transparent attempt to cash in on J.K. Rowling's highly acclaimed *Harry Potter* series, <u>ten years</u> after the publication of *Harry Potter and the Goblet of Fire* ("*Goblet*"), Plaintiff Paul Gregory Allen's meritless claim for copyright infringement alleges that in creating *Goblet*, Ms. Rowling unlawfully copied the late Adrian Jacob's 1987 book *The Adventures of Willy the Wizard — No 1 Livid Land* ("*WTW*").[1] But *WTW* and *Goblet* are nothing alike.  The plots are different.  The characters are different.  The settings are different.  The underlying themes are different.  The tones are different.  Even the level of complexity is different.  In fact, the only vague commonality essentially is that both reflect the <u>idea</u> of a competition involving wizards. The law is clear, however, that such an abstract idea is unprotectable as a matter of law and cannot support a copyright infringement claim.  As much as Plaintiff strains to find similarities between the works, no such similarities exist with respect to any protectable expression.

Rather than seeking to profit from *Goblet*, Plaintiff should instead learn from it.  In *Goblet*, the students of the Hogwarts School of Witchcraft and Wizardry are told by their headmaster that there are times when one is faced with a "choice between what is right and what is easy."  (Declaration of D. Cendali, dated Sept. 16, 2010, ("Cendali Dec."), Ex. 2, p. 724). Here, Plaintiff has clearly chosen to take the easy path, seeking to make a quick buck off of Ms. Rowling's hard work and creativity.  Defendant respectfully asks the Court now to do what is right and dismiss this case, making clear that the *Harry Potter* books are Ms. Rowling's creative

---

[1] On June 15, 2009, Plaintiff filed a virtually identical copyright infringement claim under U.K. law against Bloomsbury Publishing PLC, the *Harry Potter* books' British publisher, in the Chancery Division of England's High Court of Justice, later joining Ms. Rowling as a defendant. *See* Plaintiff's Complaint, dated July 13, 2010 ("Compl."), ¶69.  The case is still pending.  *Id.*

invention, and that Scholastic did nothing wrong in making such a captivating story available to the United States public.

## FACTUAL BACKGROUND

### A.    THE WORKS AT ISSUE[2]

#### 1.    Plaintiff's Work: *The Adventures Willy the Wizard -- No 1 Livid Land*

Published in the U.K. in 1987, *WTW* consists of 16 pages of text and 16 pages of illustrations. Cendali Dec. ¶3. It tells the story of an adult wizard named Willy. *Id.* Willy was raised in Switzerland by his father, Billy, who worked as an "angelsmith" performing "angel repairs." *Id.* at ¶4. When Willy was fourteen, his father gave him a "Book of Secrets," which was left for him by an angel and served as "his initiation into Wizardry." *Id.*

Willy lives in a "private residence" in "Memories Hideaway," a community he "created" after abducting 25 tourists "from one family, uncles, aunts and cousins," and casting a memory loss spell on them. *Id.* at ¶5. Memories Hideaway grew as its inhabitants had "matured; children had grown, married, begot children." *Id.* They now "ran the angel's repair shop and mystery factory," and "engaged in activities which Willy encouraged, fostered and turned into profitable cottage industries," enabling him to pay the "expenses of running his domain." *Id.* Willy also has "wizard apprentices" named "Tinken," "Taylor," "Soldyar," and "Delight." *Id.*

The story begins as Willy travels on a floating "velvet ladder" to "Napoleon's Castle" for a wizards' conference. *Id.* at ¶6. In the castle's great hall, which is filled with wizards from

---

[2] Complete copies of *WTW* and *Goblet* are at Exhibits 1 and 2 respectively to the Cendali Dec. Excerpts from *Harry Potter and the Sorcerer's Stone* ("*Sorcerer's Stone*") are at Exhibit 3 of the Cendali Dec. Attached to the Declaration of C. Schneider, dated Sept. 16, 2010 ("Schneider Dec.") at Exhibit 1 are excerpts from *Harry Potter and the Chamber of Secrets* ("*Chamber of Secrets*"). Attached to the Declaration of C. Ray, dated Sept. 16, 2010 ("Ray Dec.") at Exhibit 1 are excerpts from *Harry Potter and the Prisoner of Azkaban* ("*Prisoner of Azkaban*").

around the world, Willy notices a sign that reads: "'IT IS FORBIDDEN TO CAST SPELLS WHILE YOU VISIT THIS CASTLE.  THE PENALTY FOR THE THOUGHT . . . WILL BE BANISHMENT TO TREATMENT ISLAND.'"  *Id.* at ¶6.  A wizard, "Duke Wizard Louis Dix-Sept," then enters the hall, announces "'the year of the wizards' contest'" and informs the wizards that "'[e]ach of you will be given details of the competitions, prizes and penalties.'"  *Id.*

Willy then returns home and sits in his bath in his "yellow bathroom-cum-study."  *Id.* at ¶7.  "[A]t the feet end [of the bath] was a flat wall which lit up at the touch of a knob by his left hand.  A switch by the right hand tap engaged by a twiddle from his big right toe motivated a slideout screen."  *Id.*  Willy then "fed in the contest details that he had been given at the wizards' conference and having adjusted the selector, every detail of the text was magnified so that he could peruse it at his leisure."  *Id.*  In other words, Willy magnifies the contest instructions on some sort of display screen that hangs over his bathtub so that he can read the instructions while lying in his bath.  The details read: "GAIN ENTRANCE TO LIVID LAND! AND RELEASE FEMALE PRISONERS FROM ANGRY SAM'S COMPOUND.  FORTY POINTS AWARDED FOR EACH PRISONER RESCUED."  *Id.* at ¶8.  According to the prize awards list, "[w]izards achieving more than 1000 stars would receive life membership of Stellar Land."  *Id.*

Willy then instructs his apprentices to brief him on Livid Land, located "off the tip of Papua" and populated by "Angry Sam," a "colt with a kangaroo body, and a human head," as well as "Kanganatives."  *Id.* at ¶9.  The apprentices say that to reach Livid Land "'unauthorized parties will have to penetrate their Sky-to-Ocean barrier,'" and will need a password.  *Id.* at ¶10.  However, Apprentice Soldyar learns that "'there is an underground tunnel that runs from Livid Land onto the seabed and stretches for one mile from shore and finishes at a surveillance tower'" on a platform which is never guarded.  *Id.*  As the platform is very small, only Willy's "miniature

3

midget elves can penetrate," so he sends the "Pixie Elf Brigade" to be "parachute-dropped by a large multi-parachute in the region of the surveillance tower." *Id.*

Upon reaching the tower, the elves, "Bimbo-Sad-Eyes," "Botticello" and "Simple Elf," scale down the tower's walls and hide behind a kangaroo statue where they discover the password for Livid Land. *Id.* at ¶11.  Sitting in his "Ali Baba" chair, Willy can see the Pixie Elf Brigade behind the statute, although he himself is back at his home in Memories Hideaway.  *Id.*

After uncovering the Livid Land password, the elves are picked up by "Anna Eagle," an eagle who resides in Memories Hideaway, but Bimbo-Sad-Eyes remains in Livid Land.  *Id.* at ¶12.  Disguised as a "rarebit," which the "kangas" avoid as bad luck, Bimbo-Sad-Eyes is able to send daily reports to Willy.  *Id.*  Bimbo-Sad-Eyes learns of an addiction for chocolates on the island and reports it to Willy.  *Id.* at ¶13.  Willy then outlines his plan to rescue the prisoners and arranges a meeting with "Angel Leader Halo Perfectus" to discuss his plan and request the assistance of "meterological experts."  *Id.*  Halo Perfectus tells Willy that he has already briefed "Angel Weather" and assures Willy that all "'cloud formations for the next four weeks over Kanga City will be plotted with fine accuracy.'"  *Id.*

For the next week or so, the Memories Hideaway inhabitants work day and night to create a "huge casting of White Chocolate," which is put on an "Angels' Chariot" at "Angel Station XY near Heaven's Gate" awaiting Willy's signal.  *Id.* at ¶14.  Meanwhile, Willy has Apprentice Delight (his "pretty new female recruit") join Bimbo-Sad-Eyes on Livid Land after Bimbo-Sad-Eyes reports that the prison compound guard is not a "Kanga native," but "an indoctrinated Italian sailor, who invariably flirted with any female who encouraged him."  *Id.*

When Willy signals the Angels' Chariot, Halo Perfectus positions it close to a cloud above central "Kanga City."  *Id.* at ¶15.  Meanwhile, Apprentice Delight charmed the "Italian

4

guard" as the sun "caressed the chocolate cloud and CHOCOLATE RAIN POURED OVER

KANGALAND."  Because the chocolate "was of the sleep inducing variety," as the Kangas

drank the chocolate rain "they collapsed into sleeping postures."  *Id.*  After Apprentice Delight

charms the "Italian sailor" guarding the prison, Bimbo-Sad-Eyes is able to open the "female

prison section" and load the prisoners into a "large cage."  *Id.*  The story ends as Willy

announces, "'Open up the Hideaway. CHAMPBREW.  It's time for CELEBRATION!" as "[h]e

had won his particular wizard's test and the ladies were free.'"  *Id.* at ¶16.

### 2.      **Defendant's Work:** *Harry Potter and the Goblet of Fire*

Published in 2000 in the U.S., *Goblet* totals 734 pages.  *Id.* at ¶17.  It is the fourth book in

J.K. Rowling's award-winning and worldwide best selling seven-book series.  *Id.*  In the first

book, readers are introduced to the story's protagonist, Harry Potter, a boy whose wizard parents

were killed by an evil wizard, Lord Voldemort, when he was a baby.  *Id.* at ¶18.  Harry, "the boy

who lived," mysteriously survives Lord Voldemort's attack, which is assumed (incorrectly) to

have resulted in Lord Voldemort's death.  *Id.*  Harry is then placed in the care of his non-

magical, or "Muggle," aunt and uncle, the Durselys.  *Id.*  When Harry is eleven, a giant named

Rubeus Hagrid arrives to tell Harry that he is a wizard and gives Harry a letter informing him

that he has been accepted into Hogwarts School of Witchcraft and Wizardy ("Hogwarts").  *Id.* at

¶19.

Three years later in *Goblet*, Harry begins his fourth year at Hogwarts.  During the

school's annual welcome dinner, Hogwarts' headmaster, Albus Dumbledore, announces that the

school will be hosting a "Triwizard Tournament" (the "Tournament"), an inter-scholastic

competition between the three largest European schools of wizardry.  *Id.* at ¶20.  The

Tournament was established seven hundred years earlier, but had not been held for over a

century due to the high death tolls of the previous Tournaments.  *Id.*  The Tournament consists of

three tasks that take place over the course of the school year and are designed to test the champions' "magical prowess -- their daring -- their powers of deduction -- and of course, their ability to cope with danger." *Id.* at ¶21. Dumbledore explains that one student, or "champion," from each of the three schools, who must be at least 17 years old, will be chosen by the "Goblet of Fire," a "wooden cup . . . full to the brim with dancing blue-white flames." *Id.* The three champions will be judged by a five-judge panel and will compete for the prize of "the Triwizard Cup, the glory of their school, and a thousand Galleons personal prize money." *Id.* Although Harry does not submit his name to be chosen to compete, the Goblet of Fire mysteriously names him as a competitor in the Tournament, along with three other students. *Id.* at ¶22. His mysterious selection adds to Harry's already growing suspicion that something is not right.

Feeling he has no other choice, Harry takes on the Tournament's three tasks at great personal risk while also trying to uncover the mystery of who entered him as the fourth champion in the Tournament. *Id.* Harry's first task involves recovering a golden egg guarded by a dragon. *Id.* at ¶23. With the help of a hint from Professor Alastor Moody, Harry completes the task by relying on his flying skills, which he developed playing "Quidditch" -- a wizard sport that requires Harry to be good at flying on a broomstick, and ties for first place. *Id.*

In order to learn what the second task entails, the champions are told that they must solve the clue inside the egg they recovered during the first task. *Id.* at ¶24. When Harry opens the egg, however, all he hears is an incomprehensible shrieking sound. *Id.* Harry later receives a hint from the other Hogwarts champion, Cedric Diggory, his competitor and schoolmate, who advises him to take a bath with the egg. *Id.* Harry brings the egg into the prefects' bathroom, into a bathtub the size of a swimming pool. *Id.* When Harry opens the egg under the water, he is able to hear a riddle and realizes that the second task involves holding his breath underwater to

6

recover something. *Id.* at ¶25. With the help of his friends Ron and Hermione, Harry tries to

find a spell that will allow him to accomplish the task. *Id.* Just moments before the task is to

begin, when Harry still has not found a solution, Dobby, a house elf, gives him "gillyweed,"

which Harry eats before entering the Hogwarts lake to compete in the task. *Id.* at ¶26. Upon

eating the gillyweed, Harry grows gills, enabling him to breathe underwater. *Id.* Harry then

swims to locate the "merpeople" -- half mermaids, half humans -- from whom he must "recover

what [they] took," which turns out to be Harry's friend Ron, as well as other students. *Id.* at ¶27.

Taking the riddle literally, Harry believes that the students "won't come back" unless they are

saved (although it turns out that they are just under a sleeping spell and would not be harmed by

the task), and he pulls Ron and another student up to the surface with him, even though the task

only requires him to recover Ron. *Id.* Although this causes Harry to exceed the time limit, he is

awarded 45 points out of 50 for his "moral fiber" and comes in second place. *Id.*

The third and final task involves navigating a labyrinth filled with magical obstacles,

which Harry and Cedric help each other through. *Id.* at ¶28. When they reach the Triwizard

Cup, which serves as the finish line, they agree to take hold of the Cup at the same time and thus

tie the competition. *Id.* The task, however, turns out to be a trap, as the Triwizard Cup

unexpectedly turns out to be a "Portkey" which transports Harry and Cedric to a graveyard. *Id.*

at ¶29. In the graveyard, Harry and Cedric encounter Lord Voldemort and one of his supporters,

"Wormtail." *Id.* Wormtail kills Cedric, and Lord Voldemort uses some of Harry's own blood to

generate a new body and thus regain his strength. *Id.* Harry must then battle Lord Voldemort.

*Id.* at ¶30. Luckily, Harry fends off Lord Voldemort and is able to get back to the Portkey just in

time to return to Hogwarts and escape his own death. *Id.* As Cedric is dead, Harry is awarded

the prize money of 1,000 Galleons. *Id.* at ¶32. Harry offers the prize to Cedric's parents, who

refuse to take it, whereupon Harry gives it to his friends Fred and George Weasley, Ron's older twin brothers, to help them to start a wizard joke shop. *Id.* At the end of *Goblet*, Harry finally learns that Lord Voldemort used the Tournament to get Harry away from the magical protection of Hogwarts. *Id.* at ¶31. Through a servant of his at Hogwarts, Lord Voldemort made sure that Harry would participate in the Tournament, reach the Triwizard Cup and then be transported to the graveyard -- away from the school's protection. *Id.* The story ends as a somber, more mature Harry travels back home from school for the summer. *Id.* at ¶33.

## B.    LEGAL STANDARD: RULE 12(B)(6)

Dismissal is warranted where a complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Although the Court must accept a complaint's factual allegations as true, it need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness." *LLB Corp. v. Lucas Distribution, Inc.*, No. 08 Civ. 4320, 2008 WL 2743751, at *1 (S.D.N.Y. July 14, 2008) (internal citations omitted). On a Rule 12(b)(6) motion, this Court may consider the parties' works as a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."[3] *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *see also Tabachnik v. Dorsey*, No. 04 Civ. 9865, 2005 WL 1668542, at *2 (S.D.N.Y. July 15, 2005) (documents integral to the pleadings may be considered).

---

[3] The Court may consider *WTW* and *Goblet*, which are incorporated by reference in the Complaint, as well as the first three *Harry Potter* books, *Sorcerer's Stone*, *Chamber of Secrets*, and *Prisoner of Azkaban*, which the Complaint also specifically references. *See* Compl. ¶19.

## ARGUMENT

### A.   PLAINTIFF CANNOT STATE A CLAIM FOR COPYRIGHT INFRINGEMENT

#### 1.   Elements of Copyright Infringement Claim

To prevail on its claim, Plaintiff must establish (1) ownership of a valid copyright, and (2) unauthorized copying of protectable material.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).  Copying may be established either by "direct evidence of copying or by indirect evidence," by showing access to the copyrighted work[4] and similarities between the works that are probative of copying.  *Castle Rock Entm't, Inc. v. Carol Pub. Group Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).  Once copying has been established, a plaintiff must show that it was unlawful by demonstrating that there is a "substantial similarity" between the protectable elements of the works.  *Id.* at 137.

In determining whether there is substantial similarity, courts apply the "ordinary observer test," which evaluates whether an "average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999).  Where the allegedly infringing work contains protectable and nonprotectable elements, the Court must conduct a "more discerning" ordinary observer test that

---

[4] The Complaint spins the fantastic story that in 1987, *WTW*'s author, Mr. Jacobs, met with Christopher Little, of the Christopher Little Literary Agency ("CLLA"), after completing the *WTW* manuscript "for help securing a publisher within the United Kingdom."  Compl. ¶10. Plaintiff admits that Mr. Little did not secure a United Kingdom publisher for *WTW*, but claims that Mr. Jacobs arranged to have the book published by Bachman & Turner and then sent Mr. Little 1,000 copies.  *Id.* at ¶¶13-15.  Mr. Little allegedly kept these copies for seven years and then gave one to Ms. Rowling, presumably because he believed that Ms. Rowling, the award-winning author of *Sorcerer's Stone*, needed its assistance in writing *Goblet. Id.* at ¶¶18-21. Even assuming *arguendo*, and solely for the purposes of this motion, that Plaintiff could show that the 1,000 mysterious copies ever existed, were given to Mr. Little, and one was given to Ms. Rowling, this case is still subject to dismissal because of the striking lack of any substantial similarity between *WTW* and *Goblet*.

"extract[s] the unprotectable elements from . . . consideration and ask[s] whether the protectable elements, standing alone, are substantially similar." *Velez v. Sony Discos*, No. 05 Civ. 0615, 2007 WL 120686, at *7 (S.D.N.Y. Jan. 16, 2007).

"[P]rotection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1976); *see Hogan*, 48 F. Supp. 2d at 309 ("It is beyond dispute that copyright protection extends only to the expression of ideas, and not to the ideas themselves."). "[S]cenes that necessarily result from the choice of a setting or situation," *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986), "incidents, characters or setting which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980), and "thematic concepts . . . which necessarily must follow from certain plot situations," *Reyher*, 533 F.2d at 91, are unprotectable *scenes a faire*. *See also Am. Direct Mktg. v. Azad Int'l, Inc.*, 783 F. Supp. 84, 95 (E.D.N.Y. 1992) ("Material or themes commonly repeated in a certain genre are not protectable by copyright.").

If a court determines that no reasonable juror could find substantial similarity, or that any similarities only pertain to unprotected elements, it should dismiss the action. *See Buckman v. Citicorp*, No. 95 Civ. 0773, 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996) (granting 12(b)(6) motion based on absence of substantial similarity). Courts in this Circuit have routinely dismissed copyright infringement actions on this basis. *See Adams v. Warner Bros.*, No. 05 Civ. 5211, 2007 WL 1959022, at *5 (E.D.N.Y. June 29, 2007) (granting 12(b)(6) motion where "[o]ther than the idea of a transportation tunnel, which is not protectable, . . . there is simply no similarity" between plaintiff's drawing of a cylindrical shape and defendants' film featuring "Tube Cars" and television episode featuring tunnels); *Le Book Publ'g, Inc. v. Black Book*

*Photography, Inc.*, 418 F. Supp. 2d 305, 310 (S.D.N.Y. 2005) (granting 12(b)(6) motion where the parties' works were not substantially similar); *Bell v. Blaze Magazine*, No. 99 Civ. 262718, 2001 WL 262718, at *3 (S.D.N.Y. Mar. 16, 2001) (granting 12(b)(6) motion where any similarity between plaintiff's manuscript and defendant's magazine constituted ideas such as hip-hop and prison life, "which are not protected by the copyright laws"); *Boyle v. Stephens, Inc.*, No. 97 Civ. 1351, 1998 WL 80175, at *4 (E.D.N.Y. Feb. 25, 1998) (finding no substantial similarity between parties' brochures and dismissing  plaintiff's copyright infringement claim pursuant to Rule 12(b)(6)).

## B.   A COMPARISON OF THE WORKS SHOWS NO SUBSTANTIAL SIMILARITY

In assessing substantial similarity between literary works, courts commonly compare the plot, characters, settings, and themes, as well as the total concept and feel of the works.  *See Williams v. Crichton*, 84 F.3d 581, 588-91 (2d Cir. 1996) (finding no substantial similarity after examining themes, characters, plot, sequence, pace, setting, and total concept and feel of works); *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 306 (E.D.N.Y. 2009) (finding no substantial similarity between film treatment and movie given differences regarding with respect to plot, characters, themes, structure, sequence, feel and pace); *Hogan*, 48 F. Supp. 2d at 311-13 (assessing the characters, setting, plot, sequence, and total concept and feel of the works in finding no substantial similarity).

Here, although Plaintiff strains to find similarities between the works, oftentimes even going so far as to mischaracterize the works in an attempt to make an apple look like an orange, looking at each of these elements it is apparent that *WTW* and *Goblet* could not be more

different.[5] Any similarities exist only at the most general level, constituting ideas rather than protectable expression, and thus cannot support a copyright infringement claim. Moreover, many of the similarities that Plaintiff alleges in its Complaint are elements that Ms. Rowling developed in the first three *Harry Potter* books, and not the fourth *Harry Potter* book at issue, *Goblet*.[6] As Plaintiff asserts no claim of infringement with respect to any of the first three *Harry Potter* books, such elements are irrelevant and cannot support Plaintiff's claim. Compl. ¶1.

**2.**     **The Works' Plot Elements Are Not Similar**

      a.     <u>The Overarching Storylines Differ Completely</u>

Plaintiff argues that *WTW* and *Goblet* both "tell the story of a wizard competition, and that the protagonist of each book is a wizard who takes part in -- and ultimately wins -- the competition." Compl. ¶26. Although the works do involve wizards and some form of a competition, once one goes beyond this level of abstraction, any similarities with respect to the plots of the works disappear. A more accurate description of *WTW* is that it tells the story of an adult wizard who uses his team of apprentice wizards, as well as elves and angels, to parachute on to the island of Livid Land, uncover a secret password, charm an "Italian sailor," and position a giant casting of sleep-inducing chocolate in the clouds, which rains down on the island,

---

[5] It is black letter law that in determining copyright infringement, "the works themselves supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings." *Walker*, 615 F. Supp. at 434.

[6] Plaintiff presumably did not claim copyright infringement as to the first three *Harry Potter* books because it recognized that they are even more dissimilar to *WTW* than is *Goblet*. Plaintiff may have also been aware that Scholastic could easily establish that Ms. Rowling completed the manuscript for *Sorcerer's Stone* and submitted it to CLLA and other agencies long before she ever met Mr. Little, negating any claim of prior access. Regardless of the reasons for Plaintiff's strategic choices, however, the key point is that Plaintiff's lawsuit is directed only at *Goblet*.

enabling female prisoners to be released from a prison, loaded into a cage, and transported off the island and allowing Willy to win his wizard contest.  Cendali Dec. ¶¶10-16.

In contrast, *Goblet* involves a boy-wizard named Harry Potter who, in competing in the three tasks of a Tournament hosted at his school, uses his flying skills in the first task of the Tournament to outwit a fire-breathing dragon and recover a golden egg, eats a magical substance called "gillyweed" that enables him to breathe underwater and retrieve his friends at the bottom of Hogwarts lake in the second task, and navigates a labyrinth filled with magical obstacles in the third and final task, which turns out to be a trap and leads him right into the hands of the evil Lord Voldemort, whom he fights and narrowly escapes with his life.  Cendali Dec. ¶¶20-33. Ultimately, Harry, unlike Willy, does not win the competition, but rather ties for first place with his classmate Cedric Diggory.  *Id.* at ¶28.  Thus, the storylines differ completely.

      b.    <u>The Competitions In Each Work Are Different</u>

Focusing on each book's competitions, it is clear that they have nothing in common beyond the "idea" of a competition involving wizards.  Compl. ¶¶54-57.  For example, Willy takes part in a <u>single</u> competition, with no apparent competitors, which involves rescuing prisoners guarded by an "Italian sailor" from a prison on an island with a "Sky-to-Ocean barrier" populated by "Kanganatives."  Cendali Dec. ¶¶8, 10, 14.  Harry, however,  faces <u>three</u> separate tasks against three specific competitors -- Victor Krum from the Durmstrang school, Fleur Delacour from the Beauxbatons school, and Cedric Diggory from Hogwarts.  *Id.* at ¶¶21, 22.  In the second task, which Plaintiff argues is similar to Willy's competition, rather than rescuing prisoners from a prison on an island off the coast of Papua penetrated only by a secret password, Harry must recover a magically sleeping friend from a lake at his school, which is not restricted in any way.  *Id.* at ¶¶26, 27.  Also, the second task's main challenge, which does not exist in *WTW*, is to find a way to breath underwater.  *Id.* at ¶25.  Harry's second task also involves

"merpeople" who are not "guarding" the friends like *WTW*'s "Italian sailor," but rather are merely helping to administer the task. *Id.* at ¶27. Thus, there are no similarities between the tasks.

Plaintiff also claims similarities exist as to the means by which Willy and Harry receive instructions about their respective tasks, again pointing to Harry's second task. Compl. ¶¶40-42. This claim is unfounded. In *WTW*, while lying in a bathtub in his "bathroom-cum-study," Willy magnifies the contest details and reads them off of a screen in the comfort of his home. Cendali Dec. ¶7. Harry, on the other hand, goes to great lengths to uncover what lies in store for him in the second task of the Tournament. Although he is told that the golden dragon egg will provide him with a clue with respect to the task, upon first opening the egg he only hears indecipherable shrieking. *Id.* at ¶24. Not until his schoolmate encourages him to take the egg with him into the bath, and a ghost named Moaning Myrtle instructs him to go under the bath water with the egg, does the shrieking finally becomes an understandable song. *Id.* But even then, all Harry knows is that the task will require him to hold his breath underwater for an hour in order to recover something -- what that is, however, he does not know. *Id.* at ¶25. Thus, there are no similarities with respect to how Willy and Harry learn the details of their respective tasks.

Similarly, Plaintiff argues that both Willy and Harry "have friends who conduct library research" and rely on helpers to complete their tasks. Compl. ¶¶50-52. In *Goblet*, however, Harry and his friends conduct research over an extended period, seeking to solve the tasks. For example, prior to the second task, Harry "sat with Hermione and Ron in the library as the sun set outside, tearing feverishly through page after page of spells, hidden from one another by massive piles of books on the desk in front of each of them." Schneider Dec. ¶18. In *WTW*, the only mention of library research is a comment that one of Willy's helpers "has a library of reference

14

books on uncharted lands and rivers." *Id*. At best, any similarity consists of the idea of "research," and is far from actionable.

Likewise, the help that Willy and Harry each receive from others could not be more different. Compl. ¶¶51-52. For example, in *Goblet*, Harry receives unsolicited advice from Moaning Myrtle the ghost and Dobby the house elf, both of whom give him information that will help him to compete in the task that lies ahead. Schneider Dec. ¶¶19-20. Harry later learns, however, that such assistance was due to Lord Voldemort's efforts to ensure that Harry makes it through the Tournament and into his trap. Cendali Dec. ¶31. Thus, unlike in *WTW*, where Willy orders his helpers to provide him the password to Livid Land and send him daily reports regarding the island so that he can win the competition, the assistance given to Harry in *Goblet* involves very different motives, has much larger implications, and ultimately puts Harry's own life at risk.

Also, contrary to Plaintiff's allegations, the competitions do not use "substantially identical systems of scoring and reward." Compl. ¶39. Rather, in *WTW*, the competitor is awarded "forty points" for "each prisoner rescued," and "Wizards achieving more than 1000 stars would receive life membership of Stellar Land." Schneider Dec. ¶10. As there are a total of 10 prisoners to be rescued, Willy can presumably only receive a total of 400 "points" upon rescuing all of the prisoners and it is not clear from the story what the relationship is between "points" and "stars." In contrast, the school champions in the Tournament compete for the prize of "the Triwizard Cup, the glory of their school, and a thousand Galleons," or wizard dollars. *Id*. With respect to the scoring of the Tournament, the first and second tasks are scored out of 50 points by a panel of five judges, and the third task is judged based upon who can navigate the labyrinth and reach the Triwizard Cup first. *Id*. Once again, no similarity exists.

15

c.    The Means Of Transportation Are Different

Plaintiff's claim that the works involve "similar means of magical transportation" is also a mischaracterization of the actual content of the works. Compl. ¶64. For example, Plaintiff tries to compare *WTW*'s "swan taxis" and *Goblet*'s "Knight Bus." "Swan taxis," however, are actual flying swans that are invisible except for their eyes, and are used to transport wizards or other objects. Ray Dec. ¶13. In contrast, the "Knight Bus" is only mentioned in *Goblet* to identify "Stan Shunpicket," a wizard who was the conductor "on the triple-decker Knight Bus." *Id*. The Knight Bus is described more fully in book three, *Prisoner of Azkaban*, as a purple, triple-decker bus which provides emergency transportation to stranded witches or wizards and is summoned when a wizard sticks out their "wizard hand." *Id*. The Bus can be seen by the magical community, but not the non-magical community, which does not "look properly." *Id*. As such, no actionable similarity exists.

In another attempt to point to "similar" forms of transportation, Plaintiff points to a scene in *WTW* where Willy: "felt in his tunic pocket. Pocket *sesame* was always to be relied upon in an emergency. Woosh! He touched the concealed jewelled dagger that Aladdin had bequeathed to him and presto he was walking silently in Precious Boulevard off Sultan's Row." Compl. ¶64; Ray Dec. ¶12. It is not clear from this language, however, how Willy actually transports himself and whether it is a result of a "pocket sesame" spell or has something to do with Aladdin's dagger. In any case, Plaintiff attempts to argue that this is similar to the "Portkeys" used in *Goblet*. However, in *Goblet* any object can be transformed into a "Portkey" (with the help of a spell) and thus be "used to transport wizards from one spot to another at a prearranged time." Ray Dec. ¶12. Mr. Weasley explains that there "have been two hundred Portkeys placed

at strategic points around Britain," one of which is an old boot at the top of "Stoatshead Hill," which Harry and his friends use to travel to the Quidditch World Cup.[7]  *Id.*  Thus, other than idea of being transported after touching something, there is no similarity between how Willy travels to Sultan's Row and how Harry uses Ms. Rowling's Portkeys.

Plaintiff also tries to argue that the works both include "magical trains," Compl. ¶64, however, no similarity exists here either.  In *WTW*, "Pullman-like trains made of see-through platinum" travel "six million milomiles from Earth" through the sky and are used by "Wizard Chess Players."  *Id.* at ¶14.  In contrast, Hogwarts Express is a "scarlet steam engine" that is described in more detail in the first *Harry Potter* book as a train that is realistic in appearance and function, and which is used to transport students between London and Hogwarts.  *Id.*

Although Plaintiff also tries to show similarities by arguing that both works involve "travel through use of snuff or other powder," Compl. ¶64, the works themselves make clear that no similarity exists beyond the general idea of a powder substance of some kind used in connection with travel.  For example, in *WTW*, in order to help another wizard travel to Spain, Willy gives him a "gold snuff box," instructing him to sniff it and say "'VIVA ALPHONSO, VIVA MARIA'" and then "'open the box when the swan service arrives at the Azores and you'll be transported by Eagle Service 10 .'"  Ray Dec. ¶15.  Straining to find a similarity between the works, Plaintiff points to a scene in *Goblet* where Mr. Weasley uses "floo powder" to travel to and from the Dursleys' home via their chimney.  *Id.* "Floo powder," which is first introduced in *Chamber of Secrets*, allows wizards to travel from one chimney to another in the "floo network"

---

[7] Later in *Goblet*, the Triwizard Cup also turns out to be a Portkey, and upon touching it Harry is unwittingly sent straight into the hands of Lord Voldemort.  Ray Dec. ¶12.

by throwing the powder into the flames, stepping in and shouting one's desired location. *Id.* Willy's "snuff," however, does not appear to share any of these qualities.

    d.  <u>No Similarity Between Any Protectable Elements</u>

   Even in cases involving far more common plot elements than are reflected here, courts have found no substantial similarity. *See Hudson v. Universal Pictures Corp.*, No. 01 Civ. 1008, 2004 WL 1205762, at *4 (E.D.N.Y. Apr. 29, 2004) (no reasonable juror could find substantial similarity between works both involving false accusations against African-American males, prison-like settings and escape attempts); *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 225, 2007 WL 4258196, at *6 (S.D.N.Y.  Dec. 3, 2007) (no substantial similarity where works shared the ideas of "(1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic event in light of the future"); *Rehyer*, 533 F.2d at 92 (no substantial similarity where works presented the "concept that to a lost child, the familiar face of the mother is the most beautiful face, even though the mother is not, in fact, beautiful to most" and involve events concerning the "lost child finding his or her mother, albeit with some difficulty," as such similarities were *scenes a faire*).

   For example, in *Hogan v. DC Comic*, this Court determined that although the works at issue in the case shared elements such as half-human, half vampire main characters named "Nicholas Gaunt" who both sought to uncover the truth about their origins through flashbacks or memories, were faced with the choice of pursuing good or evil, were indoctrinated into the forces of evil by killing, and had a "sinister genealogy," there was no substantial similarity between the works as "most of these similarities . . . are unprotectable ideas and themes that do not represent any original elements of plaintiffs' work." *Hogan*, 48 F. Supp. 2d at 310.

18

Moreover, to the extent any commonalities exist between the plots of the works, they occur only at the most general level and constitute *scenes a faire*. For example, a story about a wizard society would likely involve means of magical transportation for wizards. In addition, a story about a competition necessarily involves discussion of the central task of that competition, help from others in completing the task of the competition, scoring of the competition, a prize of some kind, and a winner of the competition. *See Hogan*, 48 F. Supp. 2d at 310. Thus, no substantial similarity exists between the plots of the works.

### 3.      Characters Of The Works Are Not Similar

There are also no similarities between Ms. Rowling's highly developed Harry Potter character and Mr. Jacobs' "stock" wizard character, Willy, other than the fact that both are wizards. "[N]o character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984).

Harry Potter is first introduced to readers in book one of the series as a ten-year-old boy with "a thin face, knobbly knees, black hair, and bright green eyes. He wore round glasses held together with a lot of Scotch tape" and had a "thin scar on his forehead that was shaped like a bolt of lightening." Cendali Dec. ¶18. In *Goblet*, the fourth *Harry Potter* book, Harry is 14 years old. *Id.* Willy, on the other hand, is an adult -- he lives in his own home and, unlike Harry who is still training to be a wizard, Willy has apprentice wizards working for him. *Id.* at ¶¶5. Willy also bears no resemblance to young Harry in terms of appearance as he has blond hair, blue eyes, a beard and wears an earring. *Id.*; *see Hogan*, 48 F. Supp. 2d at 312 (no substantial similarity between characters which were "drawn quite differently" and interacted with other characters differently).

The characters' backgrounds are also dissimilar. Harry's parents were both wizards who were killed when he was a baby, after which he is raised by his non-magical aunt and uncle in England. Cendali Dec. ¶18. Willy, on the other hand, is raised in Switzerland by his father who is an "angelsmith." *Id.* at ¶4. Harry and Willy also differ in the means by which they discover that they are wizards. Harry learns that he is a wizard on his eleventh birthday, from a giant who delivers a letter to Harry informing him that he has been accepted into Hogwarts. *Id.* at ¶19. In contrast, Willy's father gives him a "Book of Secrets," which was left for him by an angel and had "directions as his initiation into Wizardry." *Id.* at ¶4. Each character's schooling to become a wizard also differs. Harry is enrolled in a boarding school where he lives during the school year and studies all areas of wizardry, Ray Dec. ¶9, whereas all that readers learn of Willy's schooling is that he had been "clever at wizards' college" and that he attended a "Junior wizards' advanced students course in Palermo." *Id.*

The fact that both Willy and Harry are described as "wizards" does not support Plaintiff's claim of infringement as such a commonality is too generic to warrant copyright protection. In fact, in cases where the characters have shared much more specific characteristics, such as both being half-vampire and half human, *Hogan*, 48 F. Supp. 2d at 311, minority artists with the ability to paint the future, *Mallery*, 2007 WL 4258196, at * 7, African American FBI agents fearing for their jobs, *A Slice of Pie Productions LLC v. Wayans Bros.*, 487 F. Supp. 2d 41, 49 (D. Conn. 2007), or the "Reagan-Republican-type," the "liberal democrat" challenger, or the scheming political strategist, *Blakeman*, 613 F. Supp. 2d at 291, courts have found no substantial similarity as such shared traits constituted nothing but unprotectable ideas.

### 4.    The Settings of the Works Are Not Substantially Similar

Plaintiff tries to draw similarities between various settings in the works, however, no such similarities exist. For example, Plaintiff makes much of the fact that both works involve the

20

generic setting of a "castle" with "great hall," Compl. ¶34, however, in *WTW* the reader is only told that Willy visits "Napoleon's Castle," and is not provided with any further description of the castle. Schneider Dec. ¶5. Nor is there any description of the "great hall" beyond the fact that it "revealed a dramatic scene." *Id.* In contrast, Hogwarts castle, which is the home of the wizard boarding school, is first introduced in *Sorcerer's Stone* and is described as a "vast castle . . . [p]erched atop a high mountain" with many "turrets and towers." *Id.* Moreover, in *Goblet*, the Great Hall of Hogwarts is decorated with "[g]olden plates and goblets" that "gleamed by the light of hundreds and hundreds of candles, floating over the tables in midair" where the students enjoyed their "start-of-term feast." *Id.* These settings are not similar.

Plaintiff also asserts that both *WTW* and *Goblet* involve "wizard hospitals." Compl. ¶65. However, the single, vague reference in *WTW* to a "Chief Wizard Surgery at Hospital Space" with no further detail is not similar to "St. Mungo's Hospital for Magical Maladies and Injuries," where a Hogwarts student's parents are being treated after being tortured for information concerning Voldemort's whereabouts, nor is it similar to the hospital wing of Hogwarts, where Madam Pomfrey nurses the Hogwarts students back to health. Ray Dec. ¶16. Moreover, just as courts have found that the "setting of a dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers" are "classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo," castles with great halls and magical hospitals are *scenes a faire* that flow from the uncopyrightable idea of a story about an ancient wizard society. *Williams*, 84 F.3d at 589, *see also A Slice of Pie*, 487 F. Supp. 2d at 50 ("While both works include scenes in FBI offices, such are *scenes a faire* necessitated by the nature of the plot of each film involving law enforcement.").

Plaintiff tries to rely on the fact that both works involve bathrooms, Compl. ¶¶44-47, however, a bathroom is a stock setting that is not protectable.  *See Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005) ("The bathroom as a setting is not protectable.").  Moreover, the bathroom settings in the works differ in every respect -- from the shape of the bathtub, to the color of the bathroom, to the mixtures available to the characters to add to the bath water, to the fact that Willy's bathroom has a large, electronic screen.  In *WTW*, Willy sits in the bathtub of his own "yellow bathroom-cum-study" where he is "able to study, as the green treated water toned his body with Aqua Superba."  Schneider Dec. ¶13.  In contrast, in *Goblet*, after receiving a hint from his competitor, Harry goes to the prefects' bathroom, which is "made of white marble, including what looked like an empty, rectangular swimming pool sunk into the middle of the floor.  About a hundred golden taps stood all around the pool's edges, each with a differently colored jewel set into its handle.  There was also a diving board."  *Id*.  Again, there is no similarity beyond the idea of a bathroom.

Plaintiff also tries to claim exclusive rights to the idea of a village, arguing that both works "feature commercial villages, hidden away from the real world, that produce goods and services especially for wizards."  Compl. ¶67.  Leaving aside the fact that the idea of a village cannot be protected by copyright, the villages differ completely.  In *Harry Potter* -- Hogsmeade Village -- which is first introduced in *Prisoner of Azkaban*, is an all-wizard village that the students of Hogwarts visit (with the school's permission) following their third year to purchase sweets and "butterbeer" and do other fun activities.  Ray Dec. ¶18.  When Harry visits Hogsmeade for the first time he notes that, "Hogsmeade looked like a Christmas card; the little thatched cottages and shops were all covered in a layer of crisp snow; there were holly wreaths on the doors and strings of enchanted candles hanging on the trees."  *Id*.

22

In contrast, the village in *WTW*, "Memories Hideaway," is a community in which Willy himself lives, as opposed to one that he is only permitted to visit occasionally. *Id.* In fact, Willy created Memories Hideaway himself by capturing a family of tourists and casting a mind erasing spell on them. *Id.* Thus, rather than being an all-wizard village, non-magical inhabitants live in Memories Hideaway. They "engage[] in activities" that Willy encourages as he uses the resulting profits to pay his expenses. *Id.* Moreover, in Memories Hideaway, "[a]ll of the bungalows except the first one were made of a unique glass with little prickles which melted the falling snow on impact." *Id.* Thus, neither the purposes nor the descriptions of the villages are the same.

### 5.   The Themes Of The Works Are Not Similar

*WTW* and *Goblet* are also strikingly different with respect to their themes. In *Goblet*, intertwined with the richly developed plot that tells the story of a classic hero's journey are such complex themes as a boy's coming of age, friendship and jealousy, life and death, and the struggle between good and evil. *Goblet* grapples with these issues as the young wizards of Hogwarts confront the journey from childhood to adulthood, develop friendships and crushes, face the challenges of a competition, and are placed in mortal danger as a result of Lord Voldemort's return. As the characters experience various life-altering events, they grow and learn, and through their development, the reader's own understanding of the world -- both of the magical wizarding world as well as the world at large -- evolves, demonstrating the powerful messages and themes at work in *Goblet*.

In marked contrast, *WTW* is devoid of any discernable themes. The characters never face any difficult choices. They do not confront any type of villain. They do not experience any type of conflict. They do not demonstrate any depth. They do not experience any growth. As a

result, *WTW* does not present readers with any overarching message.  Arguing that the works

share any thematic similarities because they involve wizards and some form of a competition

"would be as irrational as saying the movie 'Animal House' is substantially similar to 'Rudy' or

'Good Will Hunting' because the movies all focus on college life." *Blakeman*, 613 F. Supp. 2d

at 307 (finding no substantial similarity where the themes of the movies shared "nothing in

common other than the backdrop of a Presidential election").

      **6.**      <u>**The Total Concept and Feel Of The Works Differ**</u>

      The total concept and feel of a literary work is comprised of the way the author selected,

coordinated and arranged the elements of his or her work, taking into consideration similarities

in "mood, details or characterization." *Reyher*, 533 F.2d at 91-92.  In comparing the total

concept and feel of the works, courts look at the nature of the works as a whole. *See Jones v.*

*CBS, Inc.*, 733 F. Supp. 748, 754 (S.D.N.Y. 1990) (comparing the "general nature and feel" of

the two works).  A plaintiff cannot simply rely on its cherry-picked list of similarities to support

a finding of a similar "concept and feel" between the works, and a "scattershot" of "generalized

similarities in characterization . . . visual elements and plot points" cannot support a finding of

substantial similarity. *Mallery*, 2007 WL 4258196, *8.

      Here, the total concept and feel of the works differ completely.  As demonstrated above,

*WTW* and *Goblet* are not similar in plot, themes, characters, or settings.  On top of these

differences, the stylistic differences between the works remove any doubt that the works are not

similar.  For example, *WTW* jumps from one tangent to another, and is riddled with grammatical

errors, typos, and confusing language, impeding a reader's -- especially a young reader's --

ability to comprehend the storyline.  In addition, the events of *WTW* are set out in a dry manner

without much, if any, detail or explanation.  The story does not work to develop the characters in

any way, aside from providing their names, nor does the story explore the relationships between

the characters, except on the most superficial level.  Thus, looking at the work as a whole, *WTW*

is a poorly crafted story that appears to have been quickly thrown together, and as a result, rather

than conveying a cohesive storyline or any themes, instead is sloppy, jumbled and confusing.

In stark contrast, the acclaimed *Goblet* has a captivating storyline that, building on the

first three *Harry Potter* books, guides readers through a unique and magical world filled with

Ms. Rowling's original creatures, curses, and games.  The book paints a vivid picture of the

various settings, including Hogwarts, and delves further into the lives of Harry, Ron, Hermione,

Professor Dumbledore, Professor Snape, and its many other characters.  In *Goblet*, Ms. Rowling

provides readers with insight not only into Harry, but all of her characters, adding further

complexity to the ongoing storyline.  And while *Goblet* on the most basic level tells the story of

a competition, it does so in order to tell a larger story about the return of evil to Harry's world in

the person of Lord Voldemort.  The tone of *Goblet* is also very distinctive, as the Tournament

places the competitors in real danger, rendering *Goblet* a suspenseful story that truly puts readers

on the edge of their seat.  Thus, just as in *Adams v. Warner Bros. Pictures Network*, where the

court found that the total concept and feel of the works was "vastly different" because the

plaintiff's work was "crudely drawn by hand and devoid of any color or discernible detail,"

whereas the defendant's work was "meticulously detailed" and "vivid," here, Plaintiff's *WTW* is

a "crudely drawn" story lacking in depth or complexity, whereas *Goblet* is a "meticulously

detailed" and complex story filled with mystery, suspense and emotion.  *Adams*, 2007 WL

1959022, at *5.  As such, the works differ in total concept and feel and are not substantially

similar.

Date: September 16, 2010                    Respectfully submitted,

                                            *s/Dale Cendali*
                                            _____
                                            Dale M. Cendali
                                            Claudia Ray
                                            Courtney L. Schneider
                                            KIRKLAND & ELLIS LLP
                                            601 Lexington Avenue
                                            New York, New York 10022
                                            Tel: 212-446-4800
                                            Fax: 212-446-4900

                                            *Attorneys for Defendant*
                                            SCHOLASTIC INC.