UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

PAUL GREGORY ALLEN, TRUSTEE
OF THE ESTATE OF ADRIAN
JACOBS,

            **Plaintiff,**

        **- against -**

SCHOLASTIC INC.,

          **Defendant.**

------------------------------------------------ X

**OPINION AND ORDER**

**10 Civ. 5335 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Paul Gregory Allen, in his capacity as the trustee of the estate of

Adrian Jacobs, brings a claim for copyright infringement against defendant

Scholastic Inc. ("Scholastic") relating to its 2000 publication in the United States

of J.K. Rowling's *Harry Potter and the Goblet of Fire* ("*Goblet of Fire*").  Plaintiff

alleges that *Goblet of Fire* unlawfully used protected expressions from *The

Adventures of Willy the Wizard — No 1 Livid Land* ("*Livid Land*"), a work

authored by Jacobs and published in the United Kingdom in 1987.  In response,

defendant now moves to dismiss the complaint on the ground that no reasonable

1

juror could find a substantial similarity between the two books. For the reasons set

forth below, defendant's motion is granted in its entirety.

## II.    BACKGROUND[1]

Because "[d]etermining whether substantial similarity exists requires

courts to engage in a 'detailed examination of the works themselves,'" I begin with

an overview of *Livid Land* and *Goblet of Fire*.[2]

### A.    *Livid Land*

#### 1.    General Overview

*Livid Land* tells the story of an adult wizard named Willy who

participates in "the year of the wizards' contest" for the chance to win life

---

[1]     The foregoing summary of the works at issue is based on my reading of both books, which were submitted as exhibits with defendant's moving papers. All other facts are drawn from the Complaint or the public domain. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.") (quotation marks and citation omitted). For purposes of this motion, all of the allegations presented in the Complaint are deemed true to the extent that they are consistent with the works themselves. *See Peter F. Gaito Architecture, LLC v. Simone Devt. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) ("In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings.") (citation and quotation omitted).

[2]     *Lewinson v. Henry Holt and Co., LLC*, 659 F. Supp. 2d 547, 562 (S.D.N.Y. 2009) (quoting *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996)).

membership in "Stellar Land [, e]very wizard's dream of retirement."[3]  The thirty-

two page book consists of sixteen pages of text by Jacobs, and sixteen pages of

accompanying color illustrations by Nick Tidman.[4]

### 2.    The Protagonist

Willy has shoulder-length blond hair, blue eyes, a beard, and a long

Pinnochio-like nose.[5]  His wardrobe consists of a hoop earring, a floor length tunic,

pointy Aladdin-type shoes, and a bent, cone-shaped hat.[6]  Willy was raised in

Switzerland by his father, an "angelsmith" who "had a contract with God [that]

gave him the exclusive monopoly [to perform repairs] on all angel defects."[7]

When he was fourteen years old, he was "given the Book of Secrets with directions

as to his initiation into Wizardry" and became the first wizard in the country.[8]

After completing Wizard's college, Willy moved to a private "new community in

---

[3]      Adrian Jacobs, *Livid Land* (1987), Ex. 1 to Declaration of Dale
Cendali in Support of Defendant's Motion to Dismiss ("Cendali Decl.") at 8.  Page
numbers do not appear in the original work but have been added for ease of
reference. *See* Cendali Decl. ¶ 1.

[4]      *See* Complaint ("Compl.) ¶ 8.

[5]      *See, e.g.*, *Livid Land* at 13.5 (illustration).

[6]      *See id.*

[7]      *Id.* at 5.

[8]      *Id.*

3

Memories Hideaway," which he created by abducting and casting a memory spell on twenty-five tourists from the same family, spiriting away their bodies, and leaving their frozen empty clothes standing erect to scare others away.[9]  Willy's privacy was subsequently ensured as news of the missing tourists spread across Europe, and the town containing Memories Hideaway was renamed from Village Romantic to Village Remorse.[10]

Inside Memories Hideaway, the abducted tourists happily run an angel repair shop, a gourmet chocolate factory, and a brewery, "activities which Willy encouraged, fostered and turned into profitable cottage industries" to meet the high "expenses of running his domain."[11]  Their "children had grown, married, begot children" and together they constitute a thriving, contented community.[12]  Several apprentice wizards — Tinken, Taylor, Solydar, and Delight — also reside in Magical Hideaway, and bestowed upon Willy an "elaborate factory . . . in protest at the conditions in which they had formerly worked."[13]

---

[9]      *Id.*

[10]     *See id.*

[11]     *Id.* at 13.

[12]     *Id.*

[13]     *Id.*

### 3.    The Plot[14]

The story begins as Willy travels to a wizard's conference held at Napoleon's Castle, which is reached by a "velvet ladder" dangling from the sky.[15] As Willy enters the "great hall" of the castle, he encounters a "dramatic scene."[16] The space is overrun with wizards of all races and nationalities, and as Willy "realizes the immensity of the Wizard brotherhood" for the first time, he is "frightened at the power it can muster."[17]  Willy is also terrified by the sight of a "large white banner printed in giant letters" declaring that spell-casting is forbidden inside the castle, and that violators will be banished to the much dreaded Treatment Island — particularly as he had just jokingly considered turning all the wizards into lizards.[18]

The conference itself is a brief affair.  A French wizard named Wizard

---

[14]    Because Allen's infringement claim is based on his assertion that both works "tell the story of a wizard competition, and the protagonist of each book is a wizard who takes part in — and ultimately wins — the competition," the plot summary only details events relevant to the competition.  Compl. ¶ 26. It is by no means clear, however, that a casual reading of *Livid Land* would readily identify the competition as the book's primary focus.  *See infra* Part III.B.1 (discussing the disjointed structure of the book and its disparate scenes).

[15]    Livid Land at 1-2.

[16]    *Id.* at 2.

[17]    *Id.* at 3.

[18]    *Id.* at 2.

Duke Louis Dix-Sept, whose head is made invisible in order to prevent the "largely uncontrollable assassination spell" invoked by "gathering[s] of more than twenty," emerges from a carriage to inaugurate the year-long wizards' tournament and instructs the attendees that they "will be given details of the competitions, prizes and penalties."[19]  Thereafter, the wizards immediately disperse, because they have "to be away from the castle environs in ten minutes."[20]  Willy uses an invisible flying swan taxi and magic powder from a gold snuff box to transport himself home to Memories Hideaway.[21]

Upon his return, Willy sits in his "yellow bathroom-cum-study [, where] he [does] his best thinking," soaks in a special water additive available only to five star wizards, and turns on a slide-out screen that emerges from the flat wall before him.[22]  After he feeds in the contest details provided at the conference, the text is magically magnified and reads: "GAIN ENTRANCE TO LIVID LAND! AND RELEASE FEMALE PRISONERS FROM ANGRY SAM'S COMPOUND. FORTY POINTS AWARDED FOR EACH PRISONER RESCUED."[23]  Wizards

---

[19]     *Id.* at 3.

[20]     *Id.*

[21]     *See id.*

[22]     *Id.* at 8.

[23]     *Id.*

who obtain more than one thousand stars receive the coveted grand prize, admission to Stellar Land.[24]

Willy immediately orders his apprentices to brief him on Livid Land by beaming them his thoughts.[25]  From them, he learns that Livid Land is an island off the tip of Papua that is inhabited by Kanganatives, beings with the torsos of humans and the legs of kangaroos.[26]  Access to Livid Land is severely restricted and virtually impossible — unauthorized visitors have to penetrate the Sky-to-Ocean barrier and supply the secret password, which is changed each month.[27] There is, however, an unguarded underground tunnel accessible from the ocean floor that is big enough only for Kanga Pygmies and, luckily, Willy's "miniature midget elves."[28]  Aided by the seven swiftest Angels in Heavenland, Willy dispatches the Pixie Elf Brigade — Bimbo-Sad-Eyes, Botticello, and Simple Elf — to the island to uncover the secret password, which they manage to do by spying on the Kanganatives.[29]  Sitting at home in Ali Baba's chair, Willy is "frequentized

---

[24]     *See id.*

[25]     *See id.*

[26]     *See id.*

[27]     *See id.*

[28]     *Id.*

[29]     *See id.* at 11.

7

into vision acute" and, through the "clarity-waves" transmitted from the Island, can see the Pixie Elf Brigade in real-time as they learn that the password is FURY.[30] Having completed their mission, the Pixie Elf Brigade, with the exception of Bimbo-Sad-Eyes, is picked up by Anna Eagle and flown back to Memories Hideaway.[31]

Disguised as a "blue rarebit," a creature avoided by Kanganatives as bad luck, Bimbo-Sad-Eyes is able to remain on Livid Land to coordinate the escape of ten female prisoners. [32] Bimbo-Sad-Eyes learns that Kanganatives are addicted to chocolate, and transmits the information to Willy through the Quebec Communicator attached from his whiskers to his left nostril.[33] After pondering for three days, Willy hatches a plan, OPERATION DIVERT, to release the prisoners; the plan is based on an idea devised by a visitor to his chocolate factory to boost Willy's chocolate sales.[34] Willy enlists the help of Angel Leader Halo Perfectus and his meteorological experts to make sleep-inducing chocolate rain pour over

---

[30]    *Id.* at 12.

[31]    *See id.*

[32]    *Id.*

[33]    *See id.*

[34]    *See id.* at 13-14, 16.

8

Livid Land and enchant the Kanganatives.[35]  As the Kanganatives sleep, the coquettish Apprentice Delight is dispatched to the island in order to charm the prison-guard while Bimbo-Sad-Eyes releases the ten female prisoners.[36]  Using the secret password, the group is easily able to leave Livid Land as Willy watches from his Ali Baba chair, happy and relaxed now that "[he] had won his particular wizard's test and the ladies were free."[37]

### B.   *Goblet of Fire*

### 1.   **General Overview**

*Goblet of Fire* is the fourth book in an international, award-winning, and best selling seven-book series written by English author J.K. Rowling.[38]  The series follows the adventures of a famous young wizard named Harry Potter from the time that he learns of his powers at age eleven until the end of his adolescence.[39]  *Goblet of Fire* chronicles Harry's participation in a tournament between rival magic schools when he is fourteen years old.   The book itself is 734

---

[35]      *See id.*

[36]      *See id.*

[37]      *Id.*  This is the very last line of the book.

[38]      *See* Cendali Decl. ¶ 17.

[39]      *See* Wikipedia, Harry Potter, available at http://en.wikipedia.org/wiki/Harry_Potter.

pages, almost all of which are entirely text; the only illustrations are small charcoal images set above the title of every new chapter.

## 2.    The Protagonist

Harry is a "skinny boy of fourteen" with large round glasses, "bright green eyes and untidy black hair."[40]  When Harry was a year old, his mother and father were killed by Lord Voldemort ("Voldemort"), "the most powerful Dark wizard for a century."[41]  Voldemort had attempted to kill Harry as well, but "the curse that had disposed of many full-grown witches and wizards in [Voldemort's] steady rise to power" over the past eleven years had mysteriously failed.[42]  Instead of killing Harry, it "rebounded upon Voldemort . . . [and] reduced [him] to something barely alive," forcing him to flee and lifting "the terror in which the secret community of witches and wizards had lived for so long."[43]  Harry was left only with a distinctive scar on his forehead shaped like a bolt of lightning, and became immediately famous in hidden wizarding world — even as he himself was unaware of its existence or his own magical origins.[44]

---

[40]    Goblet of Fire at 19.

[41]    *Id.* at 20.

[42]    *Id.*

[43]    *Id.*

[44]    *See id.*

Because Harry was raised by his non-magical, or "Muggle," aunt and uncle (the "Dursleys"), who "despised magic in any form," Harry did not learn that he was a wizard until his eleventh birthday, when he was admitted to the Hogwarts School of Witchcraft and Wizardry ("Hogwarts"), a boarding school for young wizards in training.[45]  Harry's time at Hogwarts provides a happy reprieve from the mean-spirited Dursleys, who consider him to be "about as welcome . . . as dry rot" in their home and who generally strive to make him as "miserable as possible."[46] At Hogwarts, Harry has two best friends, Ron Weasley and Hermoine Granger, from whom he is inseparable, and a headmaster, Professor Albus Dumbledore ("Dumbledore"), in whom he can confide.[47]

Hogwarts is housed in a huge, sprawling castle that cannot be seen or located by Muggles.[48]  The primary means of transportation to Hogwarts Castle is the Hogwarts Express, "a gleaming scarlet steam engine" that leaves from a magical platform found between "the apparently solid barrier dividing platforms nine and ten" in a regular train station.[49]  The most distinguished feature of the

---

[45]     *Id.* at 23.

[46]     *Id.*

[47]     *See id.*

[48]     *See id.* at 21.

[49]     *Id.* at 163.

castle is the Great Hall, a "splendid [space] . . . gleamed by the light of hundreds and hundreds of candles" and host to any newsworthy event at the school.[50]

### 3.     The Plot

*Goblet of Fire* opens during the summer holiday preceding Harry's fourth-year of Hogwarts, with several premonitions that the murderous Voldemort has returned and is planning to kill Harry.[51]  The sense of vague apprehension is tempered, however, by the promise of a great surprise awaiting the students of Hogwarts.[52]  As the students gather in the Great Hall to inaugurate the new term, Dumbledore announces that Hogwarts will host the Tri-Wizard Tournament ("Tournament"), an inter-scholastic competition in which one representative, or "champion," from each of the "three largest European schools of wizardy" competes in three magical tasks for "the Triwizard Cup, the glory of their school, and a thousand Galleons personal prize money."[53]  The Tournament consists of three surprise tasks that will take place over the school year, which are designed to test the champions' "magical prowess – their daring – their powers of deduction –

---

[50]     *Id.*

[51]     *See, e.g., id.* at 16.

[52]     *See id.* at 163.

[53]     *Id.*  at 187-88.

12

and of course, their ability to cope with danger."[54]  A five-judge panel will award

marks based on performance in each task, and "the champion with the highest total

after task three will win."[55]

Dumbledore explains that the seven-hundred year old Tournament has

been suspended for several centuries due to an alarmingly high champion death

toll, but is being reinstated in light of new safety precautions that should "ensure

that this time, no champion would find himself or herself in mortal danger."[56]

Chief among these is a strict age restriction barring contenders under age

seventeen, a "measure [considered to be] necessary, given that the tournament

tasks will still be difficult and dangerous, whatever precautions [are taken], and it

is highly unlikely that [younger] students . . . will be able to cope with them."[57]

Dumbledore instructs the students that champions will be impartially selected by a

goblet "full to the brim with dancing blue-white flames," that will shoot out a

"charred piece of parchment" naming the most worthy eligible volunteer from each

school.[58]

---

[54]    *Id.* at 255.

[55]    *Id.*

[56]    *Id.* at 187-88.

[57]    *Id.*

[58]    *Id.* at 255.

Although Harry is underage and does not submit his name for consideration, he is mysteriously named as champion in the Tournament, along with three other students — including Cedric Diggory, the intended Hogwarts representative.[59]  Harry is suspicious that his participation is the result of sinister manipulation by Voldemort, and intended to ensure his demise.[60]  Harry's fear is shared by his Defense Against the Dark Arts professor, Alastor Moody ("Professor Moody"), who is certain that the contest has been manipulated by the forces of Dark Wizardry.[61]  Nonetheless, because "[t]he placing of [a student's] name in the goblet constitutes a binding, magical contract," Harry is obligated to compete despite the great personal risk in doing so.[62]  Harry's unease is exacerbated by the alienation he feels from his peers, as only Hermoine and his professors believe that he did not volunteer for the Tournament.[63]  The vast majority of Hogwarts students — including Ron — are angered by Harry's perceived audacity and envious of his inclusion in the competition.[64]  Moreover, Harry's competitors suspect that the

---

[59]     *See id.* at 269-72.

[60]     *See id.* at 284.

[61]     *See id.* at 278-79.

[62]     *Id.* at 256.

[63]     *See id.* at 284.

[64]     *See id.* at 287.

14

contest has unfairly been rigged to allow Hogwarts an extra opportunity to attain victory, and are very aggrieved that there are four competitors instead of the intended three.[65]

The first task involves recovering a golden egg guarded by a dragon.[66] Harry learns the nature of the challenge in advance from Hagrid, his professor and friend, and, correctly assuming that Cedric will be the only competitor not similarly forewarned, shares the information with him in the interest of fairness.[67] Harry must confront the Hungarian Horntail, the most dangerous and belligerent of the four dragons that the competitors are paired up with.[68] Based upon a hint from Professor Moody, Harry completes the task by relying on the flying skills he cultivated while playing Quidditch, a wizard sport involving flying broomsticks.[69] He is awarded forty out of fifty points from the judges, and ties for first place.[70] Harry does not care about winning the round, but he is surprised and thrilled by the crowd's support for him, realizing that "[w]hen it had come down to it, when they

---

[65]     *See id.* at 278.

[66]     *See id.* at 341.

[67]     *See id.*

[68]     *See id.* at 353-57.

[69]     *See id.*

[70]     *See id.* at 360.

had seen what he was facing, most of the school had been on his side as well as Cedric's."[71]  Harry is most overjoyed that his struggle with the dragon led Ron to realize that he did not volunteer for the tournament, and ended the tension between them.[72]

The second task requires the champions to solve the clue hidden in the retrieved egg.[73]  When Harry opens the egg, however, he is greeted only by an incomprehensible "loud and screechy wailing."[74]  Preferring to focus his energies on the upcoming school dance and daydreaming about his crush, Harry puts off making sense of the clue until he receives some unexpected assistance.[75]  In gratitude for Harry's help with the first task, Cedric advises him to take a bath with the egg in the prefects' bathroom, a "magnificent" space with a bathtub the size of a swimming pool.[76]  After Moaning Myrtle, the resident bathroom ghost, clarifies that he should hold the egg under water, Harry is able to hear a riddle revealing the

---

[71]  *Id.*

[72]  *See id.* at 358.

[73]  *See id.* at 361.

[74]  *Id.* at 365.

[75]  *See, e.g., id.* at 402.

[76]  *Id.* at 460.

second task.[77]  He learns that he will have to recover something "[he'll] surely

miss" — which turns out to be Ron — from a community of merpeople, human-

mermaid hybrids who live at the bottom of a lake on the school grounds.[78]

Harry spends the next several weeks fruitlessly researching how to

breathe underwater with Hermoine and Ron.[79]  Finally, on the day of the task, a

house elf named Dobby provides Harry with a solution in the form of gillyweed, a

magical plant that enables him to grow gills.[80]  Harry reaches the bottom of the

lake first and discovers that, in addition to Ron, three other students are waiting to

be rescued by the champions.[81]  Incorrectly believing that the students will

otherwise be harmed, Harry waits for the other champions to arrive to ensure that

everyone is retrieved from the lake.[82]  When one champion fails to appear, Harry

exceeds the allotted time limit and specified scope of the task in order to pull both

Ron and the remaining student from the water.[83]  Nonetheless, he is awarded forty-

---

[77]     *See id.*

[78]     *Id.* at 463.

[79]     *See id.* at 485-86.

[80]     *See id.* at 490-91.

[81]     *See id.* at 499.

[82]     *See id.*

[83]     *See id.* at 503-04.

17

five out of fifty points for his "moral fiber" and comes in second place.[84]

The third and final task appears to be "very straightforward" — the Triwizard Cup is placed in the center of a maze filled with magical obstacles, and the first champion to touch it will be named the Tournament winner.[85] Harry and Cedric help each other navigate the labyrinth, reach the finish line before the other champions, and decide to take hold of the Triwizard Cup at the same time to tie the competition.[86] The task, however, turns out to be a trap — upon touching the trophy, they are transported to a graveyard and find themselves face-to-face with Voldemort and his servant Wormtail, who immediately kills Cedric.[87]

Harry must then battle Voldemort, who has used some of Harry's own blood to restore his strength and the full scope of his powers.[88] As they duel, a beam of light mysteriously connects their wands, causing the ghosts of Voldemort's victims to appear.[89] The ghosts are able to momentarily divert Voldemort's attention, giving Harry just enough time to grab Cedric's body and

---

[84]     *Id.* at 507.

[85]     *Id.* at 551.

[86]     *See id.* at 634-35.

[87]     *See id.* at 636-39.

[88]     *See id.* at 642-43.

[89]     *See id.* at 660-69.

18

escape Voldemort's fatal blow through the Portkey, a magical teleporting device, that transports him back to Hogwarts.[90]  Once he is back at school, Harry is whisked by someone who appears to be Professor Moody, but is actually Voldemort's most zealous supporter, Barty Crouch Jr. ("Barty"), in disguise.[91] Barty boasts that, at Voldemort's direction, he entered Harry into the Tournament and subsequently "guid[ed him] through the tasks" to ensure that Harry would reach the Triwizard Cup first and fall prey to Voldemort's trap — knowing that Hagrid, Cedric, and Dobby would help Harry, he planted the information they shared with him regarding the Tournament tasks.[92]  Dumbledore realizes that Harry is in danger just in the nick of time, and saves Harry's life.[93]

Because Cedric has been killed, Harry is awarded all of the prize money for winning the Tournament.[94]  Although he offers it to Cedric's parents, they refuse to take it and he gives it to Ron's older twin brothers to realize their dream of opening a wizard joke shop.[95]  The story ends as a more somber and

---

[90]   *See id.*

[91]   *See id.*

[92]   *Id.* at 676;  *see also id.* at 675-78.

[93]   *See id.* at 679.

[94]   *See id.* at 710.

[95]   *See id.* at 716-17; 733.

mature Harry travels back home to the Dursleys for his summer vacation.[96]

## III.   APPLICABLE LAW

### A.   Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[97] and "draw all reasonable inferences in the plaintiff's favor."[98] However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[99]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[100]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[101]  Plausibility "is not akin to a

---

[96]     *See id.* at 724.

[97]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[98]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[99]     *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[100]     *Twombly*, 550 U.S. at 564.

[101]     *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[102]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[103]

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations in the complaint. However, the court is allowed to consider documents outside the pleading if the documents are integral to the pleading or subject to judicial notice.[104]

## B.    Copyright Infringement

"To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant."[105]  "The second element is further broken down into two components: 'a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal

---

[102]    *Id.* (quotation marks omitted).

[103]    *Id.* (quotation marks omitted).

[104]    *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[105]    *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109-10 (2d Cir. 2001).

because a substantial similarity exists between the defendant's work and the

protectible elements of plaintiff's.'"[106]  "Because direct evidence is seldom

available to prove 'actual copying,' a plaintiff may fulfill this requirement with

indirect evidence."[107]  To this end, copying may be established "circumstantially by

demonstrating that the person who composed the defendant's work had access to

the copyrighted material . . . and that there are similarities between the two works

that are probative of copying."[108]  Then, to give rise to copyright infringement, the

plaintiff must demonstrate that the similarity concerns *protected* elements of the

---

[106]    *BanxCorp v. Costco Wholesale Corp.*, — F. Supp. 2d —, No. 09 Civ. 1783, 2010 WL 2802153, at *2 (S.D.N.Y. July 14, 2010) (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999) (quotation marks and emphasis omitted)). *Accord Velez v. Sony Discos*, No. 05 Civ. 0615, 2007 WL 120686, at *7 (S.D.N.Y. Jan. 16, 2007) ("Essentially, the 'actual copying' question concerns whether the defendant copied the plaintiff's work as a factual matter, and the 'improper appropriation' analysis explores whether the copying that occurred was of such a nature that copyright infringement may have taken place as a matter of law.").

[107]    *Clonus Assoc. v. Dreamworks LLC*, 457 F. Supp. 2d 432, 438 (S.D.N.Y. 2006).

[108]    *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). *Accord Adams v. Warner Bros. Pictures Network*, No. 05 Civ. 5211, 2007 WL 1959022, at *3 (E.D.N.Y. June 29, 2007) ("In the context of deciding whether the defendant copied at all (as distinguished from whether it illegally copied), similarity relates to the entire work, not just the protectible elements, and is often referred to as 'probative similarity.'" (citing *Fisher-Price, Inc. v. Well-made Toy Mfg., Corp.*, 25 F.3d 119, 123 (2d Cir. 1994))).

work at issue.[109] In other words, to be actionable, the alleged similarities must arise from "protected aesthetic expressions original to the allegedly infringed work, [rather than] . . . something in the original that is free for the taking."[110] "[T]he law is clear that a copyright does not protect an idea, but only the expression of an idea, and therefore scenes a faire, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection."[111]

"Substantial similarity exists only when 'it is protected expression in the earlier work that was copied and the amount that was copied is more than de minimis.'"[112] "The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'"[113]

---

[109]    *See LaPine v. Seinfeld*, No. 08 Civ. 128, 2009 WL 2902584, at * 5 (S.D.N.Y. Sept. 10, 2009) ("Not all copying constitutes copyright infringement; the copying must amount to an improper or unlawful appropriation.") (citing *Boisson v. Banian, Ltd*, 273 F.3d 262, 268 (2d Cir. 2001) ("Simply because a work is copyrighted does not mean every element of that work is protected.")).

[110]    *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134-35 (2d Cir. 2003)).

[111]    *Blakeman*, 613 F. Supp. 2d at 305 (quotation marks and citations omitted).

[112]    *Lewinson*, 659 F. Supp. 2d at 564 (quoting *Tufenkian Import/Export Ventures, Inc.*, 338 F.3d at 127).

[113]    *Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 294 (S.D.N.Y. 2010) (quoting *Yurman Design, Inc.*, 262 F.3d at 111).

23

Under this so-called "ordinary observer test," the essential question is whether "an

average lay observer would recognize the alleged copy as having been

appropriated from the copyrighted work."[114]  Where the allegedly infringing work

contains both protectible and non-protectible elements, however, "the usual

'ordinary observer' test becomes 'more discerning,' and requires the Court to

'attempt to extract the unprotectible elements from . . . consideration and ask

whether the *protectible elements, standing alone*, are substantially similar.'"[115]

Under either test, "a court is not to dissect the works at issue into separate

components and compare only the copyrightable elements."[116]  Instead, the inquiry

is "principally guided by comparing the contested [work's] total concept and

overall feel with that of the allegedly infringed work, as instructed by [a reader's]

_____

[114]    *Knitwaves Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) (quotation marks omitted).

[115]    *Velez*, 2007 WL 120686, at *7 (quoting *Knitwaves, Inc.*, 71 F.3d at 1002 (emphasis in original)).

[116]    *Lewinson*, 659 F. Supp. 2d at 565 (quotation marks and citations omitted).  *Accord Tufenkian Import/Export Ventures, Inc.*, 338 F.3d at 134 ("[W]hile the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation.").

24

good eyes and common sense."[117]

"When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works."[118]   Thus, while the question of substantial similarity often presents a close issue of fact that must be resolved by a jury, district courts may determine non-infringement as a matter of law "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar."[119]   The Second Circuit has recently underscored that, where "the works in questions are attached to [or referenced in] a plaintiff's complaint, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to

---

[117]     *Peter F. Gaito Architecture, LLC*, 602 F.3d at 66.  *Accord Marketing Tech. Solutions, Inc. v. Medizine LLC,* No. 09 Civ. 8122, 2010 WL 2034404, at *3 (S.D.N.Y. May 18, 2010) (noting that "'there are no bright-line rules for what constitutes substantial similarity'" and courts must necessarily rely on their own common-sense judgment in undertaking the infringement analysis (quoting *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998))).

[118]     *Peter F. Gaito Architecture, LLC*, 602 F.3d at 64.

[119]     *Id.* (quotation marks and citation omitted).

make such an evaluation."[120]

## IV.   DISCUSSION

For purposes of this motion, defendant concedes that plaintiff has a valid copyright in *Livid Land* and that actual copying occurred.[121] The operative question is thus whether a substantial similarity exists between *Goblet of Fire* and the protectible elements of *Livid Land*.[122] Because "[a] court examines the

---

[120]    *Id.* ("If, in making that evaluation, the district court determines that the two works are not substantially similar as a matter of law, the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief.") (citations and quotations omitted).

[121]    *See, e.g.*, Defendant's Reply Memorandum of Law in Further Support of Its Motion to Dismiss at 2 n.2 ("Defendant . . . assume[s] the elements of access and probative similarity *arguendo*, to allow the Court to focus on the dispositive legal issue in this case.").

[122]    Because a literary work contains both protectible and unprotectible elements, it is subject to the more discerning ordinary observer test; thus, any unprotectible elements in plaintiff's work must be excluded before substantial similarity can be assessed. *See, e.g., Lewinson*, 659 F. Supp. 2d at 565 (applying the "more discerning" approach in a literary context). Allen posits that use of the more discerning ordinary observer test would make "the case inappropriate for dismissal, since the Court cannot consider facts outside the record or draw inferences in Scholastic's favor." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Mem.") at 18. Allen's argument fails, however, because his predicate assumption – that "expert testimony is . . . necessary under the Second Circuit's 'more discerning ordinary observer test' for the purpose of filtering out [unprotectible] elements [in the allegedly infringed work]" – is incorrect. *See Peter F. Gaito Architecture, LLC*, 602 F.3d at 66 (noting that where "the district court has before it all that is necessary to make a comparison of the works in question, . . . the question of substantial similarity [can

26

similarities between the two literary works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting of the works," I address each of these features in turn.[123]

However, because the copyright infringement analysis requires direct inspection of the works in question, it is appropriate to include a representative excerpt from each book in support of my conclusion of no infringement. Thus, the opening scenes of both *Goblet of Fire* and *Livid Land* are set forth below. These excerpts convey the stark differences between the works far more convincingly than any description, and provide useful context for the ensuing discussion.

## A.  Source Excerpts

### 1.  *Livid Land*

Willy the Wizard contemplated his elaborate laboratory. It had been a gift from Tinken, Taylor and Soldyar. They were his apprentice wizards and the gift was in protest at the conditions in which they had formerly worked. *They* loved all the gleaming apparatus. The whole thing positively bored *him*.

'Ugh.'

He tapped the pipe leading to a tall retort. He hadn't

---

be resolved] as a matter of law on a Rule 12(b)(6) motion to dismiss" and does not require the aid of either expert testimony or discovery). *See also Telebrands Corp.*, 719 F. Supp. 2d at 295 (granting defendant's motion to dismiss under the more discerning ordinary observer test).

[123]    *Myrieckes v. Woods*, No. 08 Civ. 4297, 2010 WL 4903621, at * 3 (S.D.N.Y. Dec. 1, 2010) (citing *Williams*, 84 F.3d at 589).

realized it was his number two magic wand for Abracadabra! He catapulted right through the skylight, magic carpet and all, and was now proceeding speedily on Cloud 13. Oh dear! He thought. It *would* be Cloud 13.

He hated Cloud 13. It was so much more windy and unprotected and in his surprise departure he had left behind his woollies.

He felt in his tunic pocket. Pocket *sesame* was always to be relied on in an emergency. Woosh! He touched the concealed jewelled [sic] dagger that Aladdin had bequeathed to him and presto he was walking silently in Precious Boulevard off Sultan's Row, that famous Turkish road, every cobble of which was either a ruby or amethyst. Puff puff, he was out of breath. He stopped at Rainbow Fountain and peered into the magic water mumbling the Wizard's chant. His gaze pierced the surface of the pool, and the sheer beauty beneath him made him gasp.

"Big bear, Small bear, Picnic retreat. Which way to Wizard Napolean's Castle?"[124]

## 2.    *Goblet of Fire*

The villagers of Little Hangleton still called it "the Riddle House," even though it had been many years since the Riddle family had lived there. It stood on a hill overlooking the village, some of its windows boarded, tiles missing from its roof, and ivy spreading unchecked over its face. Once a fine looking manor, and easily the largest and grandest building for miles around, the Riddle House was now damp, derelict, and unoccupied.

The Little Hangletons all agreed that the old house was "creepy." Half a century ago, something strange and horrible had happened there, something that the older inhabitants of the village still liked to discuss when gossip was scarce. The story had been picked over so many times,

---

[124]    Livid Land at 1.

and had been embroidered in so many places, that nobody was quite sure what the truth was anymore.  Every version of the tale, however, started in the same place:  Fifty years before, at daybreak on a fine summer's morning, when the Riddle House had still been well-kept and impressive, a maid had entered the drawing room to find all three Riddles dead.[125]

**B.      Analysis**

**1.      Total Concept and Feel**

Because the works at issue are primarily created for children, the total concept and feel of the works — rather than their plot and character development — is the most important factor for purposes of establishing copyright infringement.[126]  Here, the contrast between the total concept and feel of the works is so stark that any serious comparison of the two strains credulity.  As an initial matter, the dramatic difference in length between *Goblet of Fire* and *Livid Land* — 734 pages and 16 pages of text, respectively — immediately undermines Allen's suggestion that the authors similarly "selected, coordinated and arranged the

---

[125]      Goblet of Fire at 1-2.

[126]      *See, e.g., Lewinson*, 659 F. Supp. 2d at 565 ("Where, as here, the works at issue are created for children, greater '[c]onsideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is [particularly] . . . appropriate . . . because children's works are often less complex than those aimed at an adult audience.'") (quoting *Williams*, 84 F.3d at 589).

elements" of their work.[127]   Indeed, a reading of the works unequivocally confirms

that they are distinctly different in both substance and style, and ultimately

engender very different visceral responses from their readers.[128]

The works vary in structure, mood, details, and characterization.

*Livid Land* progresses as a series of fragmented and often tangential scenes, each

---

[127]     *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 350
(1991). *Accord Sheldon Abend Revocable Trust v. Spielberg*, — F. Supp. 2d —,
No. 08 Civ. 7810, 2010 WL 3701343, at * 9 (S.D.N.Y. Sept. 21, 2010) (citing
*Feist* for the proposition that "[t]he total concept and feel of a work is comprised of
the way an author 'selected, coordinated and arranged the elements of his or her
work'").

[128]     *See Hudson v. Universal Studios, Inc.*, No. 04-CV-6997, 2008 WL
4701488, at *2 (S.D.N.Y. Oct. 23, 2008) ("If the similarity between two works
rests solely on a shared underlying idea, rather than the particular way in which
that idea has been portrayed, there is no substantial similarity.").
Allen attempts to introduce an interlocutory foreign order denying
summary judgment in his United Kingdom copyright infringement case against
J.K. Rowling and the British publisher of *Goblet of Fire* as evidence of substantial
similarity.  However, this Court may not consider the foreign judgment because it
involves different parties, different standards of law, and does not constitute a final
judgment. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356, 2010 WL
2836134, at *12 (S.D.N.Y. July 9, 2010) (declining to consider foreign
adjudication where defendant was not a party and ruling was not a final judgment).
In any event, Allen mischaracterizes the foreign court's decision, and its
observation that the merits of his claim are "highly improbable." Oct. 14, 2010
Judgment by Justice Kitchin of the High Court of Justice, Ex. 1 to Declaration of
Joseph A. Patella in Support of Plaintiff's Opposition to Defendant's Motion to
Dismiss, ¶ 90("The similarities upon which Mr. Allen relies seem to me to
constitute ideas which are relatively simple and abstract and I strongly incline to
the view that they are at such a high level of generality that they fall on the ideas
rather than the expression side of the line."). *Id.* ¶ 86.

of which summarily recounts Willy's various exploits without any supporting detail, contextual explanation, or suspenseful build-up. Accounts about Willy's background, travels, illnesses, business ventures, and participation in a contest are presented in the same tone and with the same level of generality. To the extent that *Livid Land* specifically aims to tell the story about Willy's participation in a contest — as opposed to providing short and self-contained anecdotes concerning his life in general — its intended subject is made clear only by the fact that the work refers to the contest in more than one chapter. Events are dryly *set forth*, rather than *described*. New characters or references frequently pop up without introduction or purpose, never to appear again. Beyond the background fact of the wizards' contest, the book lacks any cohesive narrative elements that can unify or make sense of its disparate anecdotes — a generous reading may infer that its purpose is to engage a child's attention for a few moments at a time, much like a mobile or cartoon.[129] Indeed, the text is enlivened only by the illustrations that accompany it.

     *Livid Land* is entirely devoid of a moral message or intellectual depth.

---

[129]    While perhaps harshly stated, Scholastic's observation that *Livid Land* "jumps from one tangent to another, and is riddled with grammatical errors, typos, and confusing language [that] imped[e] a reader's — especially a young reader's — ability to comprehend the storyline" is accurate. Defendant's Memorandum of Law in Further Support of Its Motion to Dismiss ("Def. Mem.") at 24-25. It took several readings of the work before I could identify basic plot elements.

It does not present any overarching message or character development.  The competition stands as an end in itself, and there is no purpose to Willy's participation aside from victory.  The characters never face any difficult choices, or experience any type of conflict.  Their feelings are not addressed and their interpersonal relationships are not explored.  Essentially, *Livid Land* offers only narration, not nuance.

In contrast, *Goblet of Fire* is a cumulative work, in which one scene builds upon and transitions to another.  The storyline is highly developed and complex, and captures the attention of both children and adults for long periods of time.  The wizard competition clearly drives the plot and is fleshed out in great detail, but it is not, in and of itself, the primary subject of the book — rather, the competition serves as packaging for various underlying storylines, such as Voldemort's return or Ron and Hermoine's romantic feelings towards each other.[130]  Indeed, Harry's ordeal is not over following his victory, because Voldemort is still on the loose and the wizard community expects to face "dark and difficult times."[131]  The text is rich in imagery, emotive and suspenseful.

---

[130]   *See, e.g.*, *Spielberg*, — F. Supp. 2d —, 2010 WL 3701343, at * 9 (finding no similarity in total concept and feel where one work "is rife with subplots, [while the other] has none").

[131]   *Goblet of Fire* at 724.

Sophisticated literary devices, such as foreshadowing, are frequently employed —

for example, Harry's scar reflexively hurts whenever Voldemort is near him,

whether or not he is aware of his presence, with the intensity of the pain

corresponding to the degree of danger he is in.

     *Goblet of Fire* has a highly developed moral core, and conveys

overarching messages through its plot.  For example, following Harry's victory and

Cedric's death in the competition, Dumbledore instructs the students at Hogwarts

that,

> in the light of Lord Voldemort's return, we are only as
> strong as we are united, as weak as we are divided. Lord
> Voldemort's gift for spreading discord and enmity is very
> great. We can fight it only by showing an equally strong
> bond of friendship and trust.  Differences of habit and
> language are nothing at all if our aims are identical and our
> hearts are open.[132]

Indeed, the book's characters are frequently subject to ethical scrutiny.  The

choices that they make are often difficult and marked by clear trade-offs, which are

explored and elaborated upon.  Harry is not concerned with winning the

competition, but with doing what is right — for example, he foregoes an easy

victory in the second task of the competition to ensure that his competitors reach

and save all the hostages at the bottom of the lake.

---

[132]    *Id.*

33

Given the vast aesthetic and substantive differences between *Livid Land* and *Goblet of Fire*, I find no overlap in their total concept and feel.

## 2.    Theme

Allen argues that both works evince themes of "friendship, teamwork, . . . the value of personal ingenuity, [and] the international scope and unity of the wizard community."[133]  It is unclear, however, that *any* discernible — let alone protectible — themes emerge from *Livid Land*'s one-dimensional and desultory account of Willy's participation in the wizard competition.[134]  The general foundations of a theme — *i.e.*, sentiment or insight, topical or symbolical occurrences, evolution of character or plot — are not readily identifiable in the text.  For example, despite being one of Allen's purported themes, *Livid Land*'s consideration of the "international scope and unity of the wizard community"[135] is limited to the following passage:

> There were wizards of all races. Chinese, with massive Mandarin hats beautifully hand painted with peasant scenes. Black and brown wizards from the Ivory Coast and Delhi. Willy wondered. Until now he'd never realised the

---

[133]    Pl. Mem. at 24.

[134]    In contrast, *Goblet of Fire* is rife with richly-developed themes, such as the struggle between good and evil, coming of age, social status and alienation, enslavement, community solidarity, and friendship.

[135]    Pl. Mem. at 24.

34

> immensity of the Wizard brotherhood. He was frightened
> at the power it could muster.[136]

A brief, perfunctory and isolated reference to a subject cannot give rise to a

cognizable theme — let alone one that is specific enough to be infringed.

Moreover, *Livid Land* does not provide even those elements necessary

to formulate and express the specific themes that plaintiff identifies in the text.  For

example, Allen identifies friendship as a theme common to both works, but Willy

does not seem to have any friends or to express any desire for companionship.

Throughout the work, he engages only in cursory and singular interactions with

acquaintances.   His primary company, and the only other recurring characters, are

various apprentices and elves — all of whom are subject to his bidding, and who

provide him with assistance in the competition only upon orders to do so.  Because

there is scant basis upon which to extrapolate any theme from *Livid Land*, there is

certainly no support for a finding of substantial similarity in this regard.

### 3.    Characters

Allen argues that the similarities between Willy and Harry provide

evidence of unlawful appropriation, because "both protagonists are famous male

wizards, initiated late into wizarding (in pre-/early adolescence), who receive

formal education in wizardry, and are chosen to compete in year-long wizard

------

[136]    Livid Land at 3.

competitions."[137]   Even accepting Allen's dubious characterizations,[138] they

---

[137]   Pl. Mem. at 21.  Allen identifies no other potential commonalities between the characters, either in his brief or the Complaint. *See, e.g., id.* at 21-22 (acknowledging that "[t]he two characters do bear some differences," such as age and level of complexity).   While Allen is correct that the "similarities between Willy and Harry need not be total to support a claim of copyright infringement," the characters must share at least some distinct attributes. *Id.* at 22.  *Accord Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) ("A stock character or basic character type . . . is not entitled to copyright protection.").  Moreover, common-sense, buoyed by references within *Goblet of Fire*, indicates that the vast majority of these characteristics were expressed in the three preceding books in the Harry Potter series; plaintiff's assertion that Harry's character is derived from *Livid Land* is thereby undermined to the extent that his infringement claim is only directed towards *Goblet of Fire*.

[138]   Allen's depiction of the similarities between Willy and Harry is misleading and subjective, if not patently inaccurate.  I offer Allen's assertion that both characters are famous as an illustrative, but by no means exclusive, example of these deficiencies.  Contrary to Allen's representation, only Harry is individually well-known and personally recognizable within the wizard community.  *Compare* Goblet of Fire at 20 ("[E]veryone in the hidden wizarding world knew [Harry's] name.  Harry had arrived at Hogwarts to find that heads turned and whispers followed him wherever he went.") *with* Livid Land at 2 (depicting a scene in which Willy must identify his "name and business" before he can be granted entry into a wizard conference to which he had been invited, and noting that Willy used magic to artificially inflate his chest measurements and generate a special voice to gain admission).  At most, a generous reading of *Livid Land* may allow Willy indirect renown by virtue of the high-quality chocolate he produces in his factory or the prolific news he generated in abducting twenty-five tourists.  *See* Livid Land at 3, 13 ("[I]n the early days Willy had contrived a spell which had provided headlines all over Europe."; "Wizard Chocolate was renowned for its high quality.").  Moreover, there are significant contextual and conceptual differences underlying the social status of each protagonist.  Harry's fame is tied into his emblematic role as a force of goodness, and elevates him to iconic status in society's battle against evil.  Nonetheless, it does not bring him either happiness or power; to the contrary, Harry's fame challenges his interpersonal relationships and makes him a target for sinister forces.  Any fame enjoyed by Willy, however, is

36

constitute a general prototype too indistinct to merit copyright protection.[139]

Because "[t]he bar for substantial similarity in a character is set quite high," courts

have found no substantial similarity between characters sharing far more specific

and developed traits.[140]

   Allen's purported list of common attributes between Willy and Harry

evokes only a general sketch of a character (*i.e.*, an unprotectible idea), rather than

a recognizable identity that can be linked to a particular figure (*i.e.*, a protected

---

rooted in his commercial exploits and devoid of any moral character; indeed, Willy
may be more aptly described as notorious. Moreover, *Goblet of Fire* incorporates
Harry's fame as a pervasive theme, while *Livid Land* accords no more than two
sentences that may arguably suggest that Willy is famous.

[139] For example, the familiar figure of the legendary wizard Merlin is
similarly portrayed in many popular myths. *See, e.g.*, Wikipedia, Merlin (film),
available at http://en.wikipedia.org/wiki/Merlin_%28film%29 (depicting the
eponymous protagonist of the 1998 miniseries 'Merlin' as a famous male wizard
who learns of his magical origins as an adolescent and is subsequently taken away
to be trained in magic in an underground palace). *Accord Tufenkian Import/Export
Ventures, Inc.*, 338 F.3d at 135 (noting that material in the public domain may be
freely borrowed).

[140] *Spielberg*, — F. Supp. 2d —, 2010 WL 3701343, at * 7. *Accord
Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 2005)
(no substantial similarity between two thirty-something self-centered bachelors
who both become trapped in a repeating day); *Hogan*, 48 F. Supp. 2d at 309-10 (no
substantial similarity between two young half-human, half-vampire male
characters named Nicholas Gaunt who both had pale skin, dark scraggly hair, and
tired eyes; were both aided by flashbacks in a personal quest to discover their
origins; and who both ultimately succumbed to the same fate and were
indoctrinated into the forces of evil by killing).

expression of that idea). The amorphous figure emerging from Allen's claimed

similarities may be either a villain or hero, acclaimed or maligned, old or young, a

social butterfly or solitary recluse — in short, he may be anyone at all. Hence,

"any similarity between the two characters exists only at a level of abstraction too

basic to permit any inference that defendant[] wrongfully appropriated any

expression of plaintiff's ideas."[141] Particularly where two diametrically opposed

characters can be constructed based on plaintiff's examples of the allegedly

infringing characteristics, there cannot be a finding of substantial similarity.

      In any event, it is unlikely that a rudimentary character like Willy can

be infringed upon at all.[142] *Livid Land* provides only a few details about Willy,

such as where he lives and what he does, but does not imbue him with a discernible

personality or distinguishable appearance. Despite serving as the protagonist of a

children's work, it is not even clear whether Willy is a 'good' moral character.[143]

---

[141]    *Arden*, 908 F. Supp. at 1261.

[142]    *See Spielberg*, — F. Supp. 2d —, 2010 WL 3701343, at * 7 ("No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines.") (quotation marks and citation omitted). *Accord Williams*, 84 F.3d at 589 ("[T]he less developed the characters, the less they can be copyrighted.").

[143]    Allen depicts Willy as a hero, but this characterization is not substantiated in the work. *See* Pl. Mem. at 22 ("Willy is the more quickly fashioned hero of a single, short volume."). Willy's participation in the

Willy's superficiality underscores that his character is but a "rough idea[] of general nature . . . instead of [a] specific expression and realization of those ideas"[144] — *i.e.*, Willy is but a bland and interchangeable medium through which a story is told, instead of a purposeful and deliberate actor. Because Willy's character does not display any creativity, it does not constitute protectible expression.[145]

### 4. Plot and Sequence

Allen argues that "[t]he plots and sequences of [*Livid Land* and *Goblet of Fire*] provide the clearest examples of the similarity between the works."[146] Yet while both works "tell the story of a wizard competition, and that

---

competition is driven by his personal desire to retire in Stellar Land, and he never displays any concern for the welfare of the hostages he is charged with rescuing. His ultimate victory is realized only through the efforts of his apprentices, who are presumably obliged to act upon his orders. Moreover, the circumstances surrounding Willy's abduction of twenty-five tourists and his disregard of the resulting panic he caused throughout Europe can arguably cast him in disrepute.

[144]     *Peter F. Gaito Architecture, LLC*, 602 F.3d at 67 (quotation marks and citations omitted).

[145]     The profile of Willy's character, however one-dimensional, is the most developed of *Livid Land*'s characters. To the extent that plaintiff argues that "there are other characters that bear similarities as alleged in the Complaint," they too are unprotectible. Pl. Mem. at 22 (citing Compl. ¶ 38 ("In both works, a French wizard arrives in a fantastical, animal-drawn carriage and plays a senior role in administering the competition.")).

[146]     *Id.* at 18.

the protagonist of each book is a wizard who takes part in – and ultimately wins – the competition," they share no similarities beyond this level of abstraction.[147] As Judge Learned Hand once observed, "[u]pon *any* work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out."[148] Here, a more discerning description of the works readily underscores their overwhelming differences in plot and sequence.

On the one hand, *Livid Land* tells the story of an adult wizard who, like many other wizards, is given a happily-accepted opportunity to secure a spot in a coveted retirement community by completing a task assigned to him through a non-adversarial and non-competitive "contest." The adult wizard is tasked with freeing several female hostages from a highly guarded prison on a remote and virtually inaccessible island, and manages to do so by devising a plan and engaging a team of apprentice wizards, elves, and angels to parachute to the island, uncover the secret password for entry, charm an Italian sailor, plant sleep-inducing chocolate in the clouds to stupefy the population, load the hostages onto a cage,

---

[147]    Compl. ¶ 26.

[148]    *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (emphasis added) ("[T]here is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.").

and transport them off the island.

On the other hand, *Goblet of Fire* tells the story of a teenage wizard who is forced to enter into a dangerous three-round tournament against three much more seasoned and well-prepared competitors to compete for the one first place prize, and who eventually wins the competition only to discover that it is a trap intended to lead to his death.  He uses his flying skills in the first task of the Tournament to out-wit the most ferocious fire-breathing dragon faced by any of the four competitors and recover a golden egg; succeeds in the second task only through the assistance of others and procures a magical substance called 'gillyweed' that enables him to breathe underwater and retrieve his friends at the bottom of the school lake, where they are temporarily being held hostage for purposes of the Tournament; and navigates a labyrinth filled with magical obstacles to achieve the third-task and tie the competition — only to be delivered right into the hands of a murderous villain, who immediately murders his friend and almost kills the hero.  Given these fundamental differences in storyline, there is little — let alone substantial — similarity between the plot and sequence of two works.[149]

---

[149]    Indeed, in attempting a narrower description of the allegedly infringing structural similarities, Allen resorts to patently inaccurate characterizations and thereby betrays the weakness of his claim.  For example, Allen posits that both competitions are "year-long, multi-event, international

In any event, the allegedly infringing plot features are not protectible elements. *First*, they are too generic to constitute an expression.  For example, Allen argues that "[i]n both books, the competition is announced in a castle, and in both cases it is in the "Great Hall" of that castle."[150]  Yet *Livid Land*'s depiction of the announcement and great hall is limited to the following sentences: (1) "The great hall of Napolean's Castle revealed a dramatic scene;" and (2) "A voice began to boom from the great hall. 'We are here today for me to inaugurate the year of

---

tournaments comprised of side-by-side, non-aggressive tasks orchestrated and scored for points by an overseeing body." Pl. Mem. at 19.  *First*, as Allen eventually concedes, the competition in *Goblet of Fire* takes place over the *school* year, not the calendar year as in *Livid Land*.  *See* Pl. Mem. at 22.  *Second*, while the *Goblet of Fire* tournament involves three tasks, the tournament in *Livid Land* only involves one task.  *See* Livid Land at 16 ("Willy had won *his* particular Wizard's test.") (emphasis added); *see also* Pl. Mem. at 19 n.9 (misquoting the relevant text as "Willy had won *this* particular Wizard's test" to suggest a multi-event competition).  *Third*, while Harry competes in tandem with the other three champions, Willy's task is completed in isolation from other tournament participants.  Indeed, it is perhaps misleading to even describe the "wizards' contest[]" in *Livid Land* as a competition — Willy does not need to defeat any other participants to secure his prize, but must simply accomplish the specific task he has been given.  *See* Livid Land at 3.  *Accord Price v. Fox Entm't Group, Inc.*, 499 F. Supp. 2d 382, 388 (S.D.N.Y. 2007) (noting that "[a]lthough various similarities do exist . . . there are sufficient dissimilarities that foreclose a finding of striking similarity" between *Dodgeball: The Movie* and *Dodgeball: A True Underdog Story*, and providing as an example the fact that "although dodgeball is the central sport in both works, the sport is not presented and used in the same manner").

[150]    Compl. ¶ 34.

the wizards' contests.'"[151]

The cursory invocation of a concept does not give rise to protectible expression — to the contrary, copyright law is intended to foster the unrestricted exchange of ideas. As the Supreme Court has explained, "[t]he primary objective of copyright is not to reward the labor of authors, but to promote the Progress of Science and useful Arts."[152]  Indeed, *Livid Land* seems itself to have borrowed concepts from the public realm.  For example, Allen points out that both Willy and Harry are in the bath when they learn information central to the task at hand; similarly, popular history regarding the Greek scientist Archimedes "tells of how he invented a method for determining the volume of an object with an irregular shape . . . [w]hile taking a bath."[153]  In a similar vein, the concept of a non-

---

[151]   Livid Land at 2, 3.  Even if these elements were protectible, there is no similarity between *Livid Land's* superficial reference to a great hall and *Goblet of Fire's* detailed exposition and frequent use of the setting throughout the work. *See, e.g.*, Goblet of Fire at 173 ("[T]he Great Hall looked its usual splendid self, decorated for the start-of-term feast. Golden plates and goblets gleamed by the light of hundreds and hundreds of candles, floating over tables in midair.").

[152]   *Feist Publ'ns., Inc.*, 499 U.S. at 350 (quotation marks and citation omitted).  *Accord Peter F. Gaito Architecture, LLC*, 602 F.3d at 68 (noting the "underlying goal of copyright to encourage others to build freely upon the ideas and information conveyed by a work") (quotation marks and citation omitted).

[153]   Wikipedia, Archimedes, http://en.wikipedia.org/wiki/Archimedes. *Accord* Compl. ¶ 45.

adversarial and self-directed 'competition' is prolific in popular culture.[154]

  *Second*, Allen attempts to portray similarities by selectively extracting various trivialities from each book, but "random similarities scattered throughout the works . . . cannot [by themselves] support a finding of substantial similarity."[155] For example, Allen notes that both competitions are scored out of one thousand units, are announced in the great hall of a castle, involve the rescue of hostages, and are the subject of bathtime ruminations by the works' respective protagonists.[156] As the Second Circuit has explained, however, "[s]uch a scattershot a pproach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another."[157]

---

[154] To name some examples: according to greek mythology, Hercules had to accomplish twelve feats in order to expiate the sin of killing his children and to be granted immortality; in Puccini's opera, *Turandot*, the main character has to solve three riddles to win the hand of a princess or forego his life; and in Mozart's *Magic Flute*, the lead figure is required to pass several tests in order to enter the Temple of Wisdom and win the hand of his beloved, although he manages to win her despite failing the tests.

[155] *Williams*, 84 F.3d at 591.

[156] *See* Pl. Mem. at 19; Compl. ¶¶ 24-68.

[157] *Williams*, 84 F.3d at 590 (noting that lists of "specific instances of similarity . . . are inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works") (quotation marks and citations omitted).

*Third,* many, if not all, of the allegedly infringing features constitute scenes a faire "that flow naturally from a work's theme rather than from an author's creativity."[158]  For example, as Scholastic observes, "a story about a competition necessarily involves discussion of the central task of the competition, scoring of the competition, a prize of some kind, and a winner of the competition."[159]   Similarly, a castle is a stock setting in stories about magical wizard societies.[160]  *Lastly,* courts have declined to find substantial similarity in situations where there has been far greater overlap in plot elements.[161]

---

[158]    *MyWebGrocer, LLC v. Hometown Info, Inc.*, 37 F.3d 190, 194 (2d Cir. 2004).

[159]    Def. Mem. at 19.

[160]    The example of the mythical legend of Merlin is again a helpful indicator of standard features within the fantasy genre, and objectively corroborates the intuitive association between wizards and castles.

[161]    *See, e.g., Mallery v. NBC Universal, Inc.*, No. 07 Civ. 225, 2007 WL 4258196, at *6 (S.D.N.Y. Dec. 3, 2007) (finding no substantial similarity where works both involved "(1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic death in the light of the future."); *Spielberg,* — F. Supp. 2d —, 2010 WL 3701343, at *6 (no substantial similarity between the short story *Rear Window* and the movie *Disturbia* where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave of boredom, . . . discovers that one of his neighbors is a murderer, . . . is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated."); *Rehyer v. Children's Television Workshop*, 533 F.2d 87, 92 (2d Cir. 1976) (finding no substantial similarity where both works involve a lost child who has difficulty

### 5.   Pace

*Goblet of Fire* is a fast-moving book with cliff-hangers in virtually

every chapter.  In contrast, *Livid Land* is unrushed and lacking a sense of urgency.

Moreover, "[t]o the extent that Plaintiff's [work] even contains 'tone' or 'pace' —

for example, the excitement, innocence or the simplicity of a moment – these

elements are certainly not original, but are common to many pieces of children's

literary works."[162]

### 6.   Setting

Allen alleges that the settings of both works indicate substantial

similarity, because each: (1) portrays magical worlds based in Europe, wizard

hospitals that treat mental illness, wizard colleges, and secret wizard communities;

(2) refers to apprentices who protested their working conditions; and (3) involves

travel using magical versions of real-world transportation or special powder.[163]

*Livid Land* merely mentions all of these ideas in passing, however, and does not

---

finding his mother because his description of her as the most beautiful woman in
the world does not, at least to strangers, comport with the "homely woman" with
whom he is ultimately reunited).

[162]     *Lewinson*, 659 F. Supp. 2d at 571 (quotation and citation omitted).
*Accord Williams*, 84 F.3d at 590 (noting that similarity in "pace, without more,
does not create an issue of overall similarity between works").

[163]     *See* Pl. Mem. at 22-23.

transform them into protected expression through any creative effort.  For example, *Livid Land* includes only a one sentence reference to apprentices who built Willy a new factory to protest their working conditions.  In contrast, the working conditions of elves appear as a frequent theme in *Goblet of Fire* as Hermoine becomes an impassioned leader of her self-driven elf-liberation movement.  Mere commonality in subject-matter cannot establish infringement.[164]  Moreover, wizard versions of real-life institutions, places, and practices are scenes a faire relating to the unprotectible theme of a wizard society.[165]  As such, there can be no substantial similarity between the settings in the works at issue.

## V.   CONCLUSION

For all the reasons discussed above, plaintiff cannot sustain his copyright infringement claim and defendant's motion to dismiss is granted in its entirety.  The Clerk of the Court is directed to close this motion [Docket No. 8] and this case.

---

[164]   *See Blakeman*, 613 F. Supp. 2d at 307 ("To say that these movies are substantially similar because of the common theme of a Presidential election would be as irrational as saying the movie 'Animal House' is substantially similar to 'Rudy' or 'Good Will Hunting' because the movies all focus on college life.").

[165]   *See Williams*, 84 F.3d at 589 ("While both . . . works share a setting of a dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers, these settings are classic scenes a faire that flow from the uncopyrightable concept of a dinosaur zoo.").

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 6, 2011

48

## - Appearances -

**For Plaintiff:**

Joseph Anthony Patella, Esq.
Andrews Kurth LLP
450 Lexington Avenue
New York, NY 10017
(212) 850-2839

Michele Pat Schwartz, Esq.
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, TX 75201
(214) 659-4578

Thomas Russell Kline, Esq.
Andrews Kurth, LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 662-2716

**For Defendant:**

Dale Margaret Cendali, Esq.
Claudia Elizabeth Ray, Esq.
Courtney Lee Schneider, Esq.
Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
(212) 446-4800